## ST. MARY'S HONOR CENTER ET AL. *v.* HICKS

No. 92–602.   Argued April 20, 1993—Decided June 25, 1993

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which WHITE, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 525.

*Gary L. Gardner*, Assistant Attorney General of Missouri, argued the cause for petitioners. With him on the brief were *Jeremiah W. Nixon*, Attorney General, and *Don M. Downing*, Deputy Attorney General.

*Charles R. Oldham* argued the cause for respondent. With him on the brief were *Elaine R. Jones, Charles Stephen Ralston, Eric Schnapper*, and *Louis Gilden*.

*Edward C. DuMont* argued the cause for the United States et al. as *amici curiae* urging affirmance. With him on the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Turner, Edwin S. Kneedler,*

*David K. Flynn, Rebecca K. Troth, Donald R. Livingston,* and *Gwendolyn Young Reams.**

JUSTICE SCALIA delivered the opinion of the Court.

We granted certiorari to determine whether, in a suit against an employer alleging intentional racial discrimination in violation of § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, 42 U. S. C. § 2000e–2(a)(1), the trier of fact's rejection of the employer's asserted reasons for its actions mandates a finding for the plaintiff.

I

Petitioner St. Mary's Honor Center (St. Mary's) is a halfway house operated by the Missouri Department of Corrections and Human Resources (MDCHR). Respondent Melvin Hicks, a black man, was hired as a correctional officer at St. Mary's in August 1978 and was promoted to shift commander, one of six supervisory positions, in February 1980.

In 1983 MDCHR conducted an investigation of the administration of St. Mary's, which resulted in extensive supervisory changes in January 1984. Respondent retained his position, but John Powell became the new chief of custody (respondent's immediate supervisor) and petitioner Steve

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* for the Equal Employment Advisory Council by *Robert E. Williams* and *Douglas S. McDowell;* for the National Association of Manufacturers by *Glen D. Nager* and *Jan S. Amundson;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Richard A. Samp,* and *Hugh Joseph Beard, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the Lawyer's Committee for Civil Rights under Law et al. by *Herbert M. Wachtell, William H. Brown III, Norman Redlich, Thomas J. Henderson, Richard T. Seymour, Colleen McMahon, Melissa T. Rosse, Isabelle Katz Pinzler, Steven R. Shapiro, Donna R. Lenhoff, Cathy Ventrell-Monsees, Antonia Hernandez,* and *E. Richard Larson;* and for the National Employment Lawyers Association by *Janette Johnson.*

Long the new superintendent. Prior to these personnel changes respondent had enjoyed a satisfactory employment record, but soon thereafter became the subject of repeated, and increasingly severe, disciplinary actions. He was suspended for five days for violations of institutional rules by his subordinates on March 3, 1984. He received a letter of reprimand for alleged failure to conduct an adequate investigation of a brawl between inmates that occurred during his shift on March 21. He was later demoted from shift commander to correctional officer for his failure to ensure that his subordinates entered their use of a St. Mary's vehicle into the official logbook on March 19, 1984. Finally, on June 7, 1984, he was discharged for threatening Powell during an exchange of heated words on April 19.

Respondent brought this suit in the United States District Court for the Eastern District of Missouri, alleging that petitioner St. Mary's violated § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–2(a)(1), and that petitioner Long violated Rev. Stat. § 1979, 42 U. S. C. § 1983, by demoting and then discharging him because of his race. After a full bench trial, the District Court found for petitioners. 756 F. Supp. 1244 (ED Mo. 1991). The United States Court of Appeals for the Eighth Circuit reversed and remanded, 970 F. 2d 487 (1992), and we granted certiorari, 506 U. S. 1042 (1993).

## II

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

> "It shall be an unlawful employment practice for an employer—
> "(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U. S. C. § 2000e–2(a).

With the goal of "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrimination," *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 255, n. 8 (1981), our opinion in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases.[1] The plaintiff in such a case, we said, must first establish, by a preponderance of the evidence, a "prima facie" case of racial discrimination. *Burdine, supra,* at 252–253. Petitioners do not challenge the District Court's finding that respondent satisfied the minimal requirements of such a prima facie case (set out in *McDonnell Douglas, supra,* at 802) by proving (1) that he is black, (2) that he was qualified for the position of shift commander, (3) that he was demoted from that position and ultimately discharged, and (4) that the position remained open and was ultimately filled by a white man. 756 F. Supp., at 1249–1250.

Under the *McDonnell Douglas* scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine, supra,* at 254. To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977). Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an expla-

---

[1] The Court of Appeals held that the purposeful-discrimination element of respondent's § 1983 claim against petitioner Long is the same as the purposeful-discrimination element of his Title VII claim against petitioner St. Mary's. 970 F. 2d 487, 490–491 (CA8 1992). Neither side challenges that proposition, and we shall assume that the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U. S. C. § 1983. Cf. *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 186 (1989) (applying framework to claims under 42 U. S. C. § 1981).

nation to rebut the prima facie case—*i. e.*, the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *Burdine*, 450 U. S., at 254. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.*, at 254–255, and n. 8. It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U. S., at 253. In this regard it operates like all presumptions, as described in Federal Rule of Evidence 301:

> "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

Respondent does not challenge the District Court's finding that petitioners sustained their burden of production by introducing evidence of two legitimate, nondiscriminatory reasons for their actions: the severity and the accumulation of rules violations committed by respondent. 756 F. Supp., at 1250. Our cases make clear that at that point the shifted burden of production became irrelevant: "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," *Burdine*, 450 U. S., at 255, and "drops from the case," *id.*, at 255, n. 10. The plaintiff then has "the full and fair opportunity to demonstrate,"

through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," *id.*, at 256, and that race was. He retains that "ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." *Ibid.*

The District Court, acting as trier of fact in this bench trial, found that the reasons petitioners gave were not the real reasons for respondent's demotion and discharge. It found that respondent was the only supervisor disciplined for violations committed by his subordinates; that similar and even more serious violations committed by respondent's co-workers were either disregarded or treated more leniently; and that Powell manufactured the final verbal confrontation in order to provoke respondent into threatening him. 756 F. Supp., at 1250–1251. It nonetheless held that respondent had failed to carry his ultimate burden of proving that *his race* was the determining factor in petitioners' decision first to demote and then to dismiss him.[2] In short, the District Court concluded that "although [respondent] has proven the existence of a crusade to terminate him, he has not proven that the crusade was racially rather than personally motivated." *Id.*, at 1252.

The Court of Appeals set this determination aside on the ground that "[o]nce [respondent] proved all of [petitioners'] proffered reasons for the adverse employment actions to be pretextual, [respondent] was entitled to judgment as a matter of law." 970 F. 2d, at 492. The Court of Appeals reasoned:

---

[2] Various considerations led it to this conclusion, including the fact that two blacks sat on the disciplinary review board that recommended disciplining respondent, that respondent's black subordinates who actually committed the violations were not disciplined, and that "the number of black employees at St. Mary's remained constant." 756 F. Supp., at 1252.

"Because all of defendants' proffered reasons were discredited, defendants were in a position of having offered no legitimate reason for their actions. In other words, defendants were in no better position than if they had remained silent, offering no rebuttal to an established inference that they had unlawfully discriminated against plaintiff on the basis of his race." *Ibid.*

That is not so. By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production, and thus placed themselves in a "better position than if they had remained silent."

In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production determination necessarily *precedes* the credibility-assessment stage. At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine. None does if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a prima facie case, and (2) the defendant has failed to meet its burden of production—*i. e.*, has failed to introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action. In that event, the court must award judgment to the plaintiff as a matter of law under Federal Rule of Civil Procedure 50(a)(1) (in the case of jury trials) or Federal Rule of Civil Procedure 52(c) (in the case of bench trials). See F. James & G. Hazard, Civil Procedure § 7.9, p. 327 (3d ed. 1985); 1 Louisell & Mueller, Federal Evidence § 70, at 568. If the defendant has failed to sustain its burden but reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie

case, then a question of fact *does* remain, which the trier of fact will be called upon to answer.[3]

If, on the other hand, the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. To resurrect it later, after the trier of fact has determined that what was "produced" to meet the burden of production is not credible, flies in the face of our holding in *Burdine* that to rebut the presumption "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." 450 U. S., at 254. The presumption, having fulfilled its role of forcing the de-

---

[3] If the finder of fact answers affirmatively—if it finds that the prima facie case *is* supported by a preponderance of the evidence—it *must* find the existence of the presumed fact of unlawful discrimination and *must*, therefore, render a verdict for the plaintiff. See *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 254, and n. 7 (1981); F. James & G. Hazard, Civil Procedure § 7.9, p. 327 (3d ed. 1985); 1 D. Louisell & C. Mueller, Federal Evidence § 70, pp. 568–569 (1977). Thus, the *effect* of failing to produce evidence to rebut the *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), presumption is not felt until the prima facie case has been *established,* either as a matter of law (because the plaintiff's facts are uncontested) or by the factfinder's determination that the plaintiff's facts are supported by a preponderance of the evidence. It is thus technically accurate to describe the sequence as we did in *Burdine:* "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." 450 U. S., at 252–253 (internal quotation marks omitted). As a practical matter, however, and in the real-life sequence of a trial, the defendant *feels* the "burden" not when the plaintiff's prima facie case is *proved,* but as soon as evidence of it is *introduced.* The defendant then knows that its failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it *unless* the plaintiff's prima facie case is held to be inadequate in law or fails to convince the factfinder. It is this practical coercion which causes the *McDonnell Douglas* presumption to function as a means of "arranging the presentation of evidence," *Watson* v. *Fort Worth Bank & Trust,* 487 U. S. 977, 986 (1988).

fendant to come forward with some response, simply drops out of the picture. *Id.*, at 255. The defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved "that the defendant intentionally discriminated against [him]" because of his race, *id.*, at 253. The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*," 970 F. 2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion." See, *e. g., Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 716 (1983) (citing *Burdine, supra,* at 256); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 187 (1989); *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 245–246 (1989) (plurality opinion of Brennan, J., joined by Marshall, BLACKMUN, and STEVENS, JJ.); *id.*, at 260 (WHITE, J., concurring in judgment); *id.*, at 270 (O'CONNOR, J., concurring in judgment);

---

[4] Contrary to the dissent's confusion-producing analysis, *post*, at 535–536, there is nothing whatever inconsistent between this statement and our later statements that (1) the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason," *infra*, at 515, and (2) "it is not enough . . . to *dis*believe the employer," *infra*, at 519. Even though (as we say here) rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination.*

*id.*, at 286–288 (KENNEDY, J., joined by THE CHIEF JUSTICE and SCALIA, J., dissenting); *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 875 (1984); cf. *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642, 659–660 (1989); *id.*, at 668 (STEVENS, J., dissenting); *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 986 (1988).

## III

Only one unfamiliar with our case law will be upset by the dissent's alarum that we are today setting aside "settled precedent," *post,* at 525, "two decades of stable law in this Court," *ibid.,* "a framework carefully crafted in precedents as old as 20 years," *post,* at 540, which "Congress is [aware]" of and has implicitly approved, *post,* at 542. Panic will certainly not break out among the courts of appeals, whose divergent views concerning the nature of the supposedly "stable law in this Court" are precisely what prompted us to take this case—a divergence in which the dissent's version of "settled precedent" cannot remotely be considered the "prevailing view." Compare, *e. g., EEOC* v. *Flasher Co.*, 986 F. 2d 1312, 1321 (CA10 1992) (finding of pretext does not mandate finding of illegal discrimination); *Galbraith* v. *Northern Telecom, Inc.*, 944 F. 2d 275, 282–283 (CA6 1991) (same) (opinion of Boggs, J.), cert. denied, 503 U. S. 945 (1992); 944 F. 2d, at 283 (same) (opinion of Guy, J., concurring in result); *Samuels* v. *Raytheon Corp.*, 934 F. 2d 388, 392 (CA1 1991) (same); *Holder* v. *City of Raleigh*, 867 F. 2d 823, 827–828 (CA4 1989) (same); *Benzies* v. *Illinois Dept. of Mental Health and Developmental Disabilities*, 810 F. 2d 146, 148 (CA7) (same) (dictum), cert. denied, 483 U. S. 1006 (1987); *Clark* v. *Huntsville City Bd. of Ed.*, 717 F. 2d 525, 529 (CA11 1983) (same) (dictum), with *Hicks* v. *St. Mary's Honor Center,* 970 F. 2d, at 492–493 (case below) (finding of pretext mandates finding of illegal discrimination), cert. granted, 506 U. S. 1042 (1993); *Tye* v. *Board of Ed. of Polaris Joint Vocational School Dist.*, 811 F. 2d 315, 320 (CA6) (same), cert.

denied, 484 U. S. 924 (1987); *King* v. *Palmer*, 250 U. S. App. D. C. 257, 260, 778 F. 2d 878, 881 (1985) (same); *Duffy* v. *Wheeling Pittsburgh Steel Corp.*, 738 F. 2d 1393, 1395–1396 (CA3) (same), cert. denied, 469 U. S. 1087 (1984); *Lopez* v. *Metropolitan Life Ins. Co.*, 930 F. 2d 157, 161 (CA2) (same) (dictum), cert. denied, 502 U. S. 880 (1991); *Caban-Wheeler* v. *Elsea*, 904 F. 2d 1549, 1554 (CA11 1990) (same) (dictum); *Thornbrough* v. *Columbus & Greenville R. Co.*, 760 F. 2d 633, 639–640, 646–647 (CA5 1985) (same) (dictum). We mean to answer the dissent's accusations in detail, by examining our cases, but at the outset it is worth noting the utter implausibility that we would ever have held what the dissent says we held.

As we have described, Title VII renders it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a)(1). Here (in the context of the now-permissible jury trials for Title VII causes of action) is what the dissent asserts we have held to be a proper assessment of liability for violation of this law: Assume that 40% of a business' work force are members of a particular minority group, a group which comprises only 10% of the relevant labor market. An applicant, who is a member of that group, applies for an opening for which he is minimally qualified, but is rejected by a hiring officer of that *same minority group*, and the search to fill the opening continues. The rejected applicant files suit for racial discrimination under Title VII, and before the suit comes to trial, the supervisor who conducted the company's hiring is fired. Under *McDonnell Douglas*, the plaintiff has a prima facie case, see 411 U. S., at 802, and under the dissent's interpretation of our law not only must the company come forward with some explanation for the refusal to hire (which it will have to try to confirm out of the

mouth of its now antagonistic former employee), but the jury must be instructed that, if they find that explanation to be *incorrect,* they must assess damages against the company, *whether or not they believe the company was guilty of racial discrimination.* The disproportionate minority makeup of the company's work force and the fact that its hiring officer was of the same minority group as the plaintiff will be irrelevant, because the plaintiff's case can be proved "indirectly by showing that the employer's proffered explanation is unworthy of credence."[5] 450 U. S., at 256. Surely nothing short of inescapable prior *holdings* (the dissent does not pretend there are any) should make one assume that this is the law we have created.

We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated.* We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) find-

---

[5] The dissent has no response to this (not at all unrealistic) hypothetical, except to assert that *surely* the employer must have "personnel records" to which it can resort to demonstrate the reason for the failure to hire. The notion that every reasonable employer keeps "personnel records" on people who never became personnel, showing *why* they did not become personnel (*i. e.,* in what respects all other people who were hired were better) seems to us highly fanciful—or for the sake of American business we hope it is. But more fundamentally, the dissent's response misses the point. Even if such "personnel records" *do* exist, it is a mockery of justice to say that if the jury believes the reason they set forth is probably not the "true" one, all the other utterly compelling evidence that discrimination was *not* the reason will then be excluded from the jury's consideration.

ing that the employer's explanation of its action was not believable. The dissent's position amounts to precisely this, *unless* what is required to establish the *McDonnell Douglas* prima facie case is a degree of proof so high that it would, in absence of rebuttal, require a directed verdict for the plaintiff (for in that case proving the employer's rebuttal noncredible would leave the plaintiff's directed-verdict case in place, and compel a judgment in his favor). Quite obviously, however, what is required to establish the *McDonnell Douglas* prima facie case is infinitely less than what a directed verdict demands. The dissent is thus left with a position that has no support in the statute, no support in the reason of the matter, no support in any holding of this Court (that is not even contended), and support, if at all, only in the dicta of this Court's opinions. It is to those that we now turn—begrudgingly, since we think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code.

The principal case on which the dissent relies is *Burdine.* While there are some statements in that opinion that could be read to support the dissent's position, all but one of them bear a meaning consistent with our interpretation, and the one exception is simply incompatible with other language in the case. *Burdine* describes the situation that obtains after the employer has met its burden of adducing a nondiscriminatory reason as follows: "Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." 450 U. S., at 253. The dissent takes this to mean that if the plaintiff proves the asserted reason to be *false,* the plaintiff wins. But a reason cannot be proved to be "a pretext *for discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason. *Burdine*'s later allusions to

proving or demonstrating simply "pretext," *e. g.*, *id.*, at 258, are reasonably understood to refer to the previously described pretext, *i. e.*, "pretext for discrimination."[6]

*Burdine* also says that when the employer has met its burden of production "the factual inquiry proceeds to a new level of specificity." *Id.*, at 255. The dissent takes this to mean that the factual inquiry reduces to whether the employer's asserted reason is true or false—if false, the defendant loses. But the "new level of specificity" may also (as we believe) refer to the fact that the inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.

In the next sentence, *Burdine* says that "[p]lacing this burden of production on the defendant thus serves . . . to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.*, at 255–256. The dissent thinks this means that the only factual issue remaining in the case is whether the employer's reason is false. But since in our view "pretext" means "pretext for discrimination," we think the sentence must be understood as addressing the form rather than the substance of the defendant's production burden: The requirement that the employer "clearly set forth" its reasons, *id.*, at 255, gives the plaintiff a "full and fair" rebuttal opportunity.

A few sentences later, *Burdine* says: "[The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of inten-

---

[6] The same is true of *McDonnell Douglas*'s concluding summary of the framework it created (relied upon by the dissent, *post*, at 530) to the effect that if the plaintiff fails to show "pretext," the challenged employment action "must stand." 411 U. S., at 807. There, as in *Burdine*, "pretext" means the pretext required earlier in the opinion, viz., "pretext for the sort of discrimination prohibited by [Title VII]," 411 U. S., at 804.

tional discrimination." *Id.*, at 256. The dissent takes this "merger" to mean that "the ultimate burden of persuading the court that she has been the victim of intentional discrimination" is *replaced* by the mere burden of "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." But that would be a merger in which the little fish swallows the big one. Surely a more reasonable reading is that proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.

Finally, in the next sentence *Burdine* says: "[The plaintiff] may succeed in this [*i. e.*, in persuading the court that she has been the victim of intentional discrimination] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas*, 411 U. S., at 804–805." *Ibid.* We must agree with the dissent on this one: The words bear no other meaning but that the falsity of the employer's explanation is *alone enough* to compel judgment for the plaintiff. The problem is that that dictum contradicts or renders inexplicable numerous other statements, both in *Burdine* itself and in our later case law—commencing with the very citation of authority *Burdine* uses to support the proposition. *McDonnell Douglas* does *not* say, at the cited pages or elsewhere, that all the plaintiff need do is disprove the employer's asserted reason. In fact, it says just the opposite: "[O]n the retrial respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection *were in fact a coverup for a racially discriminatory decision.*" 411 U. S., at 805 (emphasis added). "We . . . insist that respondent under § 703(a)(1) must be given a full and fair opportunity to demonstrate by competent evidence *that whatever the stated reasons for his rejection, the decision was in reality*

*racially premised." Id.*, at 805, n. 18 (emphasis added). The statement in question also contradicts *Burdine*'s repeated assurance (indeed, its holding) regarding the burden of persuasion: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U. S., at 253. "The plaintiff retains the burden of persuasion." *Id.*, at 256.[7] And lastly, the statement renders inexplicable *Burdine*'s explicit reliance, in describing the shifting burdens of *McDonnell Douglas*, upon authorities setting forth the classic law of presumptions we have described earlier, including Wigmore's Evidence, 450 U. S., at 253, 254, n. 7, 255, n. 8, James' and Hazard's Civil Procedure, *id.*, at 255, n. 8, Federal Rule of Evidence 301, *ibid.*, Maguire's Evidence, Common Sense and Common Law, *ibid.*, and Thayer's Preliminary Treatise on Evidence, *id.*, at 255, n. 10. In light of these inconsistencies, we think that the dictum at issue here must be regarded as an inadvertence, to the extent that it describes disproof of the defendant's reason as a totally independent, rather than an auxiliary, means of proving unlawful intent.

In sum, our interpretation of *Burdine* creates difficulty with one sentence; the dissent's interpretation causes many portions of the opinion to be incomprehensible or deceptive. But whatever doubt *Burdine* might have created was eliminated by *Aikens*. There we said, in language that cannot reasonably be mistaken, that "the ultimate question [is] discrimination *vel non."* 460 U. S., at 714. Once the defend-

---

[7] The dissent's reading leaves *some* burden of persuasion on the plaintiff, to be sure: the burden of persuading the factfinder that the employer's explanation is not true. But it would be beneath contempt for this Court, in a unanimous opinion no less, to play such word games with the concept of "leaving the burden of persuasion upon the plaintiff." By parity of analysis, it could be said that holding a criminal defendant guilty unless he comes forward with a credible alibi does not shift the ultimate burden of persuasion, so long as the Government has the burden of persuading the factfinder that the alibi is *not* credible.

ant "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide" *not* (as the dissent would have it) whether that evidence is credible, but "whether the rejection was discriminatory within the meaning of Title VII." *Id.*, at 714–715. At that stage, we said, "[t]he District Court was . . . in a position to decide the ultimate factual issue in the case," which is "whether the defendant intentionally discriminated against the plaintiff." *Id.*, at 715 (brackets and internal quotation marks omitted). The *McDonnell Douglas* methodology was "'never intended to be rigid, mechanized, or ritualistic.'" 460 U. S., at 715 (quoting *Furnco*, 438 U. S., at 577). Rather, once the defendant has responded to the plaintiff's prima facie case, "[t]he district court has before it all the evidence it needs to decide" *not* (as the dissent would have it) whether defendant's response is credible, but "whether the defendant intentionally discriminated against the plaintiff." 460 U. S., at 715 (internal quotation marks omitted). "On the state of the record at the close of the evidence, the District Court in this case should have proceeded to this specific question directly, just as district courts decide disputed questions of fact in other civil litigation." *Id.*, at 715–716. *In confirmation of this* (rather than in contradiction of it), the Court then quotes the problematic passage from *Burdine*, which says that the plaintiff may carry her burden either directly "'or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" 460 U. S., at 716. It then characterizes that passage as follows: "In short, the district court must decide which party's explanation of the employer's motivation it believes." *Ibid.* It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination. It is noteworthy that JUSTICE BLACKMUN, although joining the Court's opinion in *Aikens*, wrote a separate concurrence for the sole purpose of saying that he understood the Court's opinion to be saying what the

dissent today asserts. That concurrence was joined only by Justice Brennan. Justice Marshall would have none of that, but simply refused to join the Court's opinion, concurring without opinion in the judgment. We think there is little doubt what *Aikens* meant.

## IV

We turn, finally, to the dire practical consequences that the respondents and the dissent claim our decision today will produce. What appears to trouble the dissent more than anything is that, in its view, our rule is adopted "for the benefit of employers who have been found to have given false evidence in a court of law," whom we "favo[r]" by "exempting them from responsibility for lies." *Post*, at 537. As we shall explain, our rule in no way gives special favor to those employers whose evidence is disbelieved. But initially we must point out that there is no justification for assuming (as the dissent repeatedly does) that those employers whose evidence is disbelieved are perjurers and liars. See *ante*, at 536–537 ("the employer who lies"; "the employer's lie"; "found to have given false evidence"; "lies"); *post*, at 540 ("benefit from lying"; "must lie"; "offering false evidence"), 540, n. 13 ("employer who lies"; "employer caught in a lie"; "rewarded for its falsehoods"), 540 ("requires a party to lie"). Even if these were typically cases in which an individual defendant's sworn assertion regarding a physical occurrence was pitted against an individual plaintiff's sworn assertion regarding the same physical occurrence, surely it would be imprudent to call the party whose assertion is (by a mere preponderance of the evidence) disbelieved, a perjurer and a liar. And in these Title VII cases, the defendant is ordinarily *not* an individual but a company, which must rely upon the statement of an employee—often a relatively low-level employee—as to the central fact; and that central fact is *not* a physical occurrence, but rather that employee's state of mind. To say that the company which in good faith

introduces such testimony, or even the testifying employee himself, becomes a liar and a perjurer when the testimony is not believed, is nothing short of absurd.

Undoubtedly some employers (or at least their employees) will be lying. But even if we could readily identify these perjurers, what an extraordinary notion, that we "exempt them from responsibility for their lies" unless we enter Title VII judgments for the plaintiffs! Title VII is not a cause of action for perjury; we have other civil and criminal remedies for that. The dissent's notion of judgment-for-lying is seen to be not even a fair and evenhanded punishment for vice, when one realizes how strangely selective it is: The employer is free to lie to its heart's content about whether the plaintiff ever applied for a job, about how long he worked, how much he made—indeed, about anything and everything *except* the reason for the adverse employment action. And the plaintiff is permitted to lie about absolutely *everything* without losing a verdict he otherwise deserves. This is not a major, or even a sensible, blow against fibbery.

The respondent's argument based upon the employer's supposed lying is a more modest one: "A defendant which unsuccessfully offers a 'phony reason' logically cannot be in a better legal position [*i. e.*, the position of having overcome the presumption from the plaintiff's prima facie case] than a defendant who remains silent, and offers no reasons at all for its conduct." Brief for Respondent 21; see also Brief for United States as *Amicus Curiae* 11, 17–18. But there is no anomaly in that, once one recognizes that the *McDonnell Douglas* presumption is a *procedural* device, designed only to establish an order of proof and production. The books are full of procedural rules that place the perjurer (initially, at least) in a better position than the truthful litigant who makes no response at all. A defendant who fails to answer a complaint will, on motion, suffer a default judgment that a deceitful response could have avoided. Fed. Rule Civ. Proc. 55(a). A defendant whose answer fails to contest critical

averments in the complaint will, on motion, suffer a judgment on the pleadings that untruthful denials could have avoided. Rule 12(c). And a defendant who fails to submit affidavits creating a genuine issue of fact in response to a motion for summary judgment will suffer a dismissal that false affidavits could have avoided. Rule 56(e). In all of those cases, as under the *McDonnell Douglas* framework, perjury may purchase the defendant a chance at the factfinder—though there, as here, it also carries substantial risks, see Rules 11 and 56(g); 18 U. S. C. § 1621.

The dissent repeatedly raises a procedural objection that is impressive only to one who mistakes the basic nature of the *McDonnell Douglas* procedure. It asserts that "the Court now holds that the further enquiry [*i. e.*, the inquiry that follows the employer's response to the prima facie case] is wide open, not limited at all by the scope of the employer's proffered explanation." *Post*, at 533. The plaintiff cannot be expected to refute "reasons not articulated by the employer, but discerned in the record by the factfinder." *Ante*, at 534. He should not "be saddled with the tremendous disadvantage of having to confront, not the defined task of proving the employer's stated reasons to be false, but the amorphous requirement of disproving all possible nondiscriminatory reasons that a factfinder might find lurking in the record." *Post*, at 534–535. "Under the scheme announced today, any conceivable explanation for the employer's actions that might be suggested by the evidence, however unrelated to the employer's articulated reasons, must be addressed by [the] plaintiff." *Post*, at 537. These statements imply that the employer's "proffered explanation," his "stated reasons," his "articulated reasons," somehow exist *apart from the record*—in some pleading, or perhaps in some formal, nontestimonial statement made on behalf of the defendant to the factfinder. ("Your honor, pursuant to *McDonnell Douglas* the defendant hereby formally asserts,

as *its* reason for the dismissal at issue here, incompetence of the employee.") Of course it does not work like that. The reasons the defendant sets forth are set forth "through the introduction of admissible evidence." *Burdine,* 450 U. S., at 255. In other words, the defendant's "articulated reasons" *themselves* are to be found "lurking in the record." It thus makes no sense to contemplate "the employer who is caught in a lie, but succeeds in *injecting* into the trial an *unarticulated* reason for its actions." *Post,* at 540, n. 13 (emphasis added). There is a "lurking-in-the-record" problem, but it exists not for us but for the dissent. *If,* after the employer has met its preliminary burden, the plaintiff need not prove discrimination (and therefore need not disprove *all* other reasons suggested, no matter how vaguely, in the record) there must be some device for determining which particular portions of the record represent "articulated reasons" set forth with sufficient clarity to satisfy *McDonnell Douglas*— since it is only *that* evidence which the plaintiff must refute. But of course our *McDonnell Douglas* framework makes no provision for such a determination, which would have to be made not at the close of the trial but *in medias res,* since otherwise the plaintiff would not know what evidence to offer. It makes no sense.

Respondent contends that "[t]he litigation decision of the employer to place in controversy only . . . particular explanations eliminates from further consideration the alternative explanations that the employer chose not to advance." Brief for Respondent 15. The employer should bear, he contends, "the responsibility for its choices and the risk that plaintiff will disprove any pretextual reasons *and therefore prevail.*" *Id.,* at 30 (emphasis added). It is the "therefore" that is problematic. Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment

action by reason of (in the context of the present case) race. That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct. That remains a question for the factfinder to answer, subject, of course, to appellate review—which should be conducted on remand in this case under the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a), see, *e. g., Anderson* v. *Bessemer City*, 470 U. S. 564, 573–576 (1985).

Finally, respondent argues that it "would be particularly ill-advised" for us to come forth with the holding we pronounce today "just as Congress has provided a right to jury trials in Title VII" cases. Brief for Respondent 31. See § 102 of the Civil Rights Act of 1991, 105 Stat. 1073, 42 U. S. C. § 1981a(c) (1988 ed., Supp. III) (providing jury trial right in certain Title VII suits). We think quite the opposite is true. Clarity regarding the requisite elements of proof becomes all the more important when a jury must be instructed concerning them, and when detailed factual findings by the trial court will not be available upon review.

*       *       *

We reaffirm today what we said in *Aikens:*

"[T]he question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be 'eyewitness' testimony as to the employer's mental processes. But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof,' *Burdine*, 450 U. S., at 252, in deciding this ultimate question." 460 U. S., at 716.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE WHITE, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Twenty years ago, in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), this Court unanimously prescribed a "sensible, orderly way to evaluate the evidence" in a Title VII disparate-treatment case, giving both plaintiff and defendant fair opportunities to litigate "in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp.* v. *Waters,* 438 U. S. 567, 577 (1978). We have repeatedly reaffirmed and refined the *McDonnell Douglas* framework, most notably in *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981), another unanimous opinion. See also *Postal Service Bd. of Governors* v. *Aikens,* 460 U. S. 711 (1983); *Furnco, supra.* But today, after two decades of stable law in this Court and only relatively recent disruption in some of the Circuits, see *ante,* at 512–513, the Court abandons this practical framework together with its central purpose, which is "to sharpen the inquiry into the elusive factual question of intentional discrimination," *Burdine, supra,* at 255, n. 8. Ignoring language to the contrary in both *McDonnell Douglas* and *Burdine,* the Court holds that, once a Title VII plaintiff succeeds in showing at trial that the defendant has come forward with pretextual reasons for its actions in response to a prima facie showing of discrimination, the factfinder still may proceed to roam the record, searching for some nondiscriminatory explanation that the defendant has not raised and that the plaintiff has had no fair opportunity to disprove. Because the majority departs from settled precedent in substituting a scheme of proof for disparate-treatment actions that promises to be unfair and unworkable, I respectfully dissent.

The *McDonnell Douglas* framework that the Court inexplicably casts aside today was summarized neatly in *Burdine:*

"First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." 450 U. S., at 252–253 (citations and internal quotation marks omitted).

We adopted this three-step process to implement, in an orderly fashion, "[t]he language of Title VII," which "makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." 411 U. S., at 800. Because "Title VII tolerates no racial discrimination, subtle or otherwise," *id.*, at 801, we devised a framework that would allow both plaintiffs and the courts to deal effectively with employment discrimination revealed only through circumstantial evidence. See *Aikens, supra,* at 716 ("There will seldom be 'eyewitness' testimony as to the employer's mental processes"). This framework has gained wide acceptance, not only in cases alleging discrimination on the basis of "race, color, religion, sex, or national origin" under Title VII, 42 U. S. C. § 2000e–2, but also in similar cases, such as those alleging age discrimination under the Age Discrimination in Employment Act of 1967. See, *e. g., Halsell* v. *Kimberly-Clark Corp.,* 683 F. 2d 285, 289 (CA8 1982), cert. denied, 459 U. S. 1205 (1983); see also Brief

for Lawyers' Committee for Civil Rights et al. as *Amici Curiae* 3–4.

At the outset, under the *McDonnell Douglas* framework, a plaintiff alleging disparate treatment in the workplace in violation of Title VII must provide the basis for an inference of discrimination. In this case, as all agree, Melvin Hicks met this initial burden by proving by a preponderance of the evidence that he was black and therefore a member of a protected class; he was qualified to be a shift commander; he was demoted and then terminated; and his position remained available and was later filled by a qualified applicant.[1] See 970 F. 2d 487, 491, and n. 7 (CA8 1992). Hicks thus proved what we have called a "prima facie case" of discrimination, and it is important to note that in this context a prima facie case is indeed a proven case. Although, in other contexts, a prima facie case only requires production of enough evidence to raise an issue for the trier of fact, here it means that the plaintiff has actually established the elements of the prima facie case to the satisfaction of the factfinder by a preponderance of the evidence. See *Burdine,* 450 U. S., at 253, 254, n. 7. By doing so, Hicks "eliminat[ed] the most common nondiscriminatory reasons" for demotion and firing: that he was unqualified for the position or that the position was no longer available. *Id.,* at 254. Given our assumption that "people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting," we have explained that a prima facie case implies discrimination "because we presume [the employer's] acts, if otherwise unexplained, are more likely than not based on the consider-

---

[1] The majority, following the courts below, mentions that Hicks's position was filled by a white male. *Ante,* at 506 (citing the District Court's opinion); see 970 F. 2d 487, 491, n. 7 (CA8 1992). This Court has not directly addressed the question whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material, and that issue is not before us today. Cf. *Cumpiano* v. *Banco Santander Puerto Rico,* 902 F. 2d 148, 154–155 (CA1 1990) (identity of replacement is not relevant).

ation of impermissible factors." *Furnco,* 438 U. S., at 577; see also *Burdine, supra,* at 254.

Under *McDonnell Douglas* and *Burdine,* however, proof of a prima facie case not only raises an inference of discrimination; in the absence of further evidence, it also creates a mandatory presumption in favor of the plaintiff. 450 U. S., at 254, n. 7. Although the employer bears no trial burden at all until the plaintiff proves his prima facie case, once the plaintiff does so the employer must either respond or lose. As we made clear in *Burdine,* "[I]f the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff." *Id.,* at 254; see *ante,* at 510, n. 3 (in these circumstances, the factfinder "*must* find the existence of the presumed fact of unlawful discrimination and *must,* therefore, render a verdict for the plaintiff") (emphasis in original). Thus, if the employer remains silent because it acted for a reason it is too embarrassed to reveal, or for a reason it fails to discover, see *ante,* at 513, the plaintiff is entitled to judgment under *Burdine.*

Obviously, it would be unfair to bar an employer from coming forward at this stage with a nondiscriminatory explanation for its actions, since the lack of an open position and the plaintiff's lack of qualifications do not exhaust the set of nondiscriminatory reasons that might explain an adverse personnel decision. If the trier of fact could not consider other explanations, employers' autonomy would be curtailed far beyond what is needed to rectify the discrimination identified by Congress. Cf. *Furnco, supra,* at 577–578 (Title VII "does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees"). On the other hand, it would be equally unfair and utterly impractical to saddle the victims of discrimination with the burden of either producing direct evidence of discriminatory intent or eliminating the entire universe of possible nondiscriminatory reasons for a personnel decision. The Court in *McDonnell Douglas* reconciled these competing interests in a very sen-

sible way by requiring the employer to "articulate," through the introduction of admissible evidence, one or more "legitimate, nondiscriminatory reason[s]" for its actions. 411 U. S., at 802; *Burdine, supra,* at 254–255. Proof of a prima facie case thus serves as a catalyst obligating the employer to step forward with an explanation for its actions. St. Mary's, in this case, used this opportunity to provide two reasons for its treatment of Hicks: the severity and accumulation of rule infractions he had allegedly committed. 970 F. 2d, at 491.

The Court emphasizes that the employer's obligation at this stage is only a burden of production, *ante,* at 506–507, 509; see 450 U. S., at 254–255, and that, if the employer meets the burden, the presumption entitling the plaintiff to judgment "drops from the case," *id.,* at 255, n. 10; see *ante,* at 507. This much is certainly true,[2] but the obligation also serves an important function neglected by the majority, in requiring the employer "to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." 450 U. S., at 255–256. The employer, in other words, has a "burden of production" that gives it the right to choose the scope of the factual issues to be resolved by the factfinder. But investing the employer with this choice has no point unless the scope it chooses binds the employer as well as the plaintiff. Nor does it make sense to tell the employer, as this Court has done, that its explanation of legitimate reasons "must be clear and reasonably specific," if the factfinder can rely on a reason not clearly articulated, or on one not articulated at

---

[2] The majority contends that it would "fl[y] in the face of our holding in *Burdine*" to "resurrect" this mandatory presumption at a later stage, in cases where the plaintiff proves that the employer's proffered reasons are pretextual. *Ante,* at 510. Hicks does not argue to the contrary. See Brief for Respondent 20, n. 4 (citing Fed. Rule Evid. 301). The question presented in this case is not whether the mandatory presumption is resurrected (everyone agrees that it is not), but whether the factual enquiry is narrowed by the *McDonnell Douglas* framework to the question of pretext.

all, to rule in favor of the employer.[3]  *Id.*, at 258; see *id.*, at 255, n. 9 ("An articulation not admitted into evidence will not suffice").

Once the employer chooses the battleground in this manner, "the factual inquiry proceeds to a new level of specificity." *Id.*, at 255.  During this final, more specific enquiry, the employer has no burden to prove that its proffered reasons are true; rather, the plaintiff must prove by a preponderance of the evidence that the proffered reasons are pretextual.[4]  *Id.*, at 256.  *McDonnell Douglas* makes it clear that if the plaintiff fails to show "pretext," the challenged employment action "must stand."  411 U. S., at 807.  If, on the other hand, the plaintiff carries his burden of showing "pretext," the court "must order a prompt and appropriate remedy."[5]  *Ibid.*  Or, as we said in *Burdine:* "[The plaintiff]

---

[3] The majority is simply wrong when it suggests that my reading of *McDonnell Douglas* and *Burdine* proceeds on the assumption that the employer's reasons must be stated "apart from the record." *Ante*, at 522 (emphasis omitted).  As I mentioned above, and I repeat here, such reasons must be set forth "through the introduction of admissible evidence." *Supra*, at 529; see *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 255 (1981).  Such reasons cannot simply be found "lurking in the record," as the Court suggests, *ante*, at 523, for *Burdine* requires the employer to articulate its reasons through testimony or other admissible evidence that is "clear and reasonably specific," 450 U. S., at 258.  Accordingly, the plaintiff need not worry about waiting for the court to identify the employer's reasons at the end of trial, or in this case six months after trial, because *McDonnell Douglas* and *Burdine* require the employer to articulate its reasons clearly during trial.  No one, for example, had any trouble in this case identifying the two reasons for Hicks's dismissal that St. Mary's articulated during trial.

[4] We clarified this aspect of the *McDonnell Douglas* framework in *Burdine*, where the question presented was "whether, after the plaintiff has proved a prima facie case of discriminatory treatment, the burden shifts to the defendant to persuade the court by a preponderance of the evidence that legitimate, nondiscriminatory reasons for the challenged employment action existed."  450 U. S., at 250.

[5] The Court makes a halfhearted attempt to rewrite these passages from *McDonnell Douglas*, arguing that "pretext for discrimination" should appear where "pretext" actually does. *Ante*, at 516, and n. 6.  I seriously

now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."[6]  450 U. S., at 256. *Burdine* drives home the point that the case has proceeded to "a new level of specificity" by explaining that the plaintiff can meet his burden of persuasion in either of two ways: "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[7]  *Ibid.;* see *Aikens,* 460 U. S., at 716

doubt that such a change in diction would have altered the meaning of these crucial passages in the manner the majority suggests, see n. 7, *infra,* but even on the majority's assumption that there is a crucial difference, it must believe that the *McDonnell Douglas* Court was rather sloppy in summarizing its own opinion. Earlier in the *McDonnell Douglas* opinion, the Court does state that an employer may not use a plaintiff's conduct "as a pretext for . . . discrimination." 411 U. S., at 804; see *ante,* at 516, n. 6 (quoting this sentence to justify rewriting the *McDonnell Douglas* summary). But in the next sentence, when the *McDonnell Douglas* Court's focus shifts from what the employer may not do to what the plaintiff must show, the Court states that the plaintiff must "be afforded a fair opportunity to show that [the employer's] stated reason for [the plaintiff's] rejection was in fact pretext," plain and simple. 411 U. S., at 804. To the extent choosing between "pretext" and "pretext for discrimination" is important, the *McDonnell Douglas* Court's diction appears to be consistent, not sloppy. *Burdine,* of course, nails down the point that the plaintiff satisfies his burden simply by proving that the employer's explanation does not deserve credence. See *infra* this page.

[6] The majority puts forward what it calls "a more reasonable reading" of this passage, *ante,* at 517, but its chosen interpretation of the "merger" that occurs is flatly contradicted by the very next sentence in *Burdine,* which indicates, as the majority subsequently admits, *ante,* at 517, that the burden of persuasion is limited to the question of pretext. It seems to me "more reasonable" to interpret the "merger" language in harmony with, rather than in contradiction to, its immediate context in *Burdine.*

[7] The majority's effort to rewrite *Burdine* centers on repudiating this passage, see *ante,* at 517–520, which has provided specific, concrete guidance to courts and Title VII litigants for more than a decade, and on replacing "pretext" wherever it appears with "pretext for discrimination,"

(quoting this language from *Burdine*); 460 U. S., at 717–718 (BLACKMUN, J., joined by Brennan, J., concurring); see also *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 287–289 (1989) (KENNEDY, J., dissenting) (discussing these "two alternative methods" and relying on JUSTICE BLACKMUN's concurrence in *Aikens*). That the plaintiff can succeed simply by showing that "the employer's proffered explanation is unworthy of credence" indicates that the case has been narrowed to the question whether the employer's proffered reasons are pretextual.[8] Thus, because Hicks carried his burden of persuasion by showing that St. Mary's proffered reasons were

as defined by the majority, see *ante*, at 515–516. These two efforts are intertwined, for *Burdine* tells us specifically how a plaintiff can prove either "pretext" or "pretext for discrimination": "*either* directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U. S., at 256 (emphasis added). The majority's chosen method of proving "pretext for discrimination" changes *Burdine*'s "either . . . or" into a "both . . . and": "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Ante*, at 515 (emphasis deleted). The majority thus takes a shorthand phrase from *Burdine* ("pretext for discrimination"), discovers requirements in the phrase that are directly at odds with the specific requirements actually set out in *Burdine*, and then rewrites *Burdine* in light of this "discovery." No one "[f]amiliar with our case law," *ante*, at 512, will be persuaded by this strategy.

[8] That the sole, and therefore determinative, issue left at this stage is pretext is further indicated by our discussion in *McDonnell Douglas* of the various types of evidence "that may be relevant to any showing of pretext," 411 U. S., at 804, by our decision to reverse in *Furnco Constr. Corp.* v. *Waters*, 438 U. S. 567 (1978), because the Court of Appeals "did not conclude that the [challenged] practices were a pretext for discrimination," *id.*, at 578, and by our reminder in *Burdine* that even after the employer meets the plaintiff's prima facie case, the "evidence previously introduced by the plaintiff to establish a prima facie case" and the "inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the [employer's] explanation is pretextual," 450 U. S., at 255, n. 10.

"unworthy of credence," the Court of Appeals properly concluded that he was entitled to judgment.[9]   970 F. 2d, at 492.

The Court today decides to abandon the settled law that sets out this structure for trying disparate-treatment Title VII cases, only to adopt a scheme that will be unfair to plaintiffs, unworkable in practice, and inexplicable in forgiving employers who present false evidence in court.   Under the majority's scheme, once the employer succeeds in meeting its burden of production, "the *McDonnell Douglas* framework . . . is no longer relevant." *Ante*, at 510.   Whereas we said in *Burdine* that if the employer carries its burden of production, "the factual inquiry proceeds to a new level of specificity," 450 U. S., at 255, the Court now holds that the further enquiry is wide open, not limited at all by the scope of the employer's proffered explanation.[10]   Despite the Court's assiduous effort to reinterpret our precedents, it remains clear that today's decision stems from a flat misreading of *Burdine* and ignores the central purpose of the *McDonnell Douglas* framework, which is "progressively to sharpen the inquiry

---

[9] The foregoing analysis of burdens describes who wins on various combinations of evidence and proof.   It may or may not also describe the actual sequence of events at trial.   In a bench trial, for example, the parties may be limited in their presentation of evidence until the court has decided whether the plaintiff has made his prima facie showing.   But the court also may allow in all the evidence at once.   In such a situation, under our decision in *Aikens*, the defendant will have to choose whether it wishes simply to attack the prima facie case or whether it wants to present nondiscriminatory reasons for its actions.   If the defendant chooses the former approach, the factfinder will decide at the end of the trial whether the plaintiff has proven his prima facie case.   If the defendant takes the latter approach, the only question for the factfinder will be the issue of pretext.   *Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 715 (1983); see *ante*, at 510, n. 3.

[10] Under the Court's unlikely interpretation of the "new level of specificity" called for by *Burdine* (and repeated in *Aikens*, see 460 U. S., at 715), the issues facing the plaintiff and the court can be discovered anywhere in the evidence the parties have introduced concerning discriminatory motivation.   *Ante*, at 516.

into the elusive factual question of intentional discrimination." 450 U. S., at 255, n. 8. We have repeatedly identified the compelling reason for limiting the factual issues in the final stage of a *McDonnell Douglas* case as "the requirement that the plaintiff be afforded a full and fair opportunity to demonstrate pretext." 450 U. S., at 258 (internal quotation marks omitted); see *id.*, at 256 (the plaintiff "must have the opportunity to demonstrate" pretext); *Aikens, supra,* at 716, n. 5; *Furnco,* 438 U. S., at 578; *McDonnell Douglas,* 411 U. S., at 805. The majority fails to explain how the plaintiff, under its scheme, will ever have a "full and fair opportunity" to demonstrate that reasons not articulated by the employer, but discerned in the record by the factfinder, are also unworthy of credence. The Court thus transforms the employer's burden of production from a device used to provide notice and promote fairness into a misleading and potentially useless ritual.

The majority's scheme greatly disfavors Title VII plaintiffs without the good luck to have direct evidence of discriminatory intent. The Court repeats the truism that the plaintiff has the "ultimate burden" of proving discrimination, see *ante,* at 507, 508, 511, 518, without ever facing the practical question of how the plaintiff without such direct evidence can meet this burden. *Burdine* provides the answer, telling us that such a plaintiff may succeed in meeting his ultimate burden of proving discrimination "indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U. S., at 256; see *Aikens,* 460 U. S., at 716; *id.,* at 717–718 (BLACKMUN, J., joined by Brennan, J., concurring). The possibility of some practical procedure for addressing what *Burdine* calls indirect proof is crucial to the success of most Title VII claims, for the simple reason that employers who discriminate are not likely to announce their discriminatory motive. And yet, under the majority's scheme, a victim of discrimination lacking direct evidence will now be saddled with the tremendous disadvantage of having to confront, not

the defined task of proving the employer's stated reasons to be false, but the amorphous requirement of disproving all possible nondiscriminatory reasons that a factfinder might find lurking in the record. In the Court's own words, the plaintiff must "disprove *all* other reasons suggested, no matter how vaguely, in the record." *Ante,* at 523 (emphasis in original).

While the Court appears to acknowledge that a plaintiff will have the task of disproving even vaguely suggested reasons, and while it recognizes the need for "[c]larity regarding the requisite elements of proof," *ante,* at 524, it nonetheless gives conflicting signals about the scope of its holding in this case. In one passage, the Court states that although proof of the falsity of the employer's proffered reasons does not "compe[l] judgment for the plaintiff," such evidence, without more, "will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Ante,* at 511 (emphasis deleted). The same view is implicit in the Court's decision to remand this case, *ante,* at 524–525, keeping Hicks's chance of winning a judgment alive although he has done no more (in addition to proving his prima facie case) than show that the reasons proffered by St. Mary's are unworthy of credence. But other language in the Court's opinion supports a more extreme conclusion, that proof of the falsity of the employer's articulated reasons will not even be sufficient to sustain judgment for the plaintiff. For example, the Court twice states that the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Ante,* at 515; see *ante,* at 507–508. In addition, in summing up its reading of our earlier cases, the Court states that "[i]t is not enough . . . to disbelieve the employer." *Ante,* at 519 (emphasis deleted). This "pretext-plus" approach would turn *Burdine* on its head, see n. 7, *supra,* and it would result in summary judgment for the employer in the many cases where the plaintiff has no evidence beyond that required to prove a prima facie case and to show that the employer's

articulated reasons are unworthy of credence. Cf. *Carter* v. *Duncan-Huggins, Ltd.*, 234 U. S. App. D. C. 126, 146, 727 F. 2d 1225, 1245 (1984) (Scalia, J., dissenting) ("[I]n order to get to the jury the plaintiff would . . . have to introduce some evidence . . . that the *basis* for [the] discriminatory treatment was *race*") (emphasis in original). See generally Lanctot, The Defendant Lies and the Plaintiff Loses: The Fallacy of the "Pretext-Plus" Rule in Employment Discrimination Cases, 43 Hastings L. J. 57 (1991) (criticizing the "pretext-plus" approach).

The Court fails to explain, moreover, under either interpretation of its holding, why proof that the employer's articulated reasons are "unpersuasive, or even obviously contrived," *ante*, at 524, falls short. Under *McDonnell Douglas* and *Burdine*, there would be no reason in this situation to question discriminatory intent. The plaintiff has raised an inference of discrimination (though no longer a presumption) through proof of his prima facie case, and as we noted in *Burdine*, this circumstantial proof of discrimination can also be used by the plaintiff to show pretext. 450 U. S., at 255, n. 10. Such proof is merely strengthened by showing, through use of further evidence, that the employer's articulated reasons are false, since "common experience" tells us that it is "more likely than not" that the employer who lies is simply trying to cover up the illegality alleged by the plaintiff. *Furnco*, 438 U. S., at 577. Unless *McDonnell Douglas*'s command to structure and limit the case as the employer chooses is to be rendered meaningless, we should not look beyond the employer's lie by assuming the possible existence of other reasons the employer might have proffered without lying. By telling the factfinder to keep digging in cases where the plaintiff's proof of pretext turns on showing the employer's reasons to be unworthy of credence, the majority rejects the very point of the *McDonnell Douglas* rule requiring the scope of the factual enquiry to be lim-

ited, albeit in a manner chosen by the employer. What is more, the Court is throwing out the rule for the benefit of employers who have been found to have given false evidence in a court of law. There is simply no justification for favoring these employers by exempting them from responsibility for lies.[11] It may indeed be true that such employers have nondiscriminatory reasons for their actions, but ones so shameful that they wish to conceal them. One can understand human frailty and the natural desire to conceal it, however, without finding in it a justification to dispense with an orderly procedure for getting at "the elusive factual question of intentional discrimination." *Burdine*, 450 U. S., at 255, n. 8.

With no justification in the employer's favor, the consequences to actual and potential Title VII litigants stand out sharply. To the extent that workers like Melvin Hicks decide not to sue, given the uncertainties they would face under the majority's scheme, the legislative purpose in adopting Title VII will be frustrated. To the extent such workers nevertheless decide to press forward, the result will likely be wasted time, effort, and money for all concerned. Under the scheme announced today, any conceivable explanation for the employer's actions that might be suggested by the evidence, however unrelated to the employer's articulated reasons, must be addressed by a plaintiff who does not

---

[11] Although the majority chides me for referring to employers who offer false evidence in court as "liars," see *ante*, at 520, it was the first to place such employers in the company of perjurers, see *ante*, at 522. In any event, it is hardly "absurd" to say that an individual is lying when the factfinder does not believe his testimony, whether he is testifying on his own behalf or as the agent of a corporation. *Ante*, at 520–521. Factfinders constantly must decide whether explanations offered in court are true, and when they conclude, by a preponderance of the evidence, that a proffered explanation is false, it is not unfair to call that explanation a lie. To label it "perjury," a criminal concept, would be jumping the gun, but only the majority has employed that term. See *ante*, at 520–522.

wish to risk losing. Since the Court does not say whether a trial court may limit the introduction of evidence at trial to what is relevant to the employer's articulated reasons, and since the employer can win on the possibility of an unstated reason, the scope of admissible evidence at trial presumably includes any evidence potentially relevant to "the ultimate question" of discrimination, unlimited by the employer's stated reasons. *Ante*, at 511. If so, Title VII trials promise to be tedious affairs. But even if, on the contrary, relevant evidence is still somehow to be limited by reference to the employer's reasons, however "vaguely" articulated, the careful plaintiff will have to anticipate all the side issues that might arise even in a more limited evidentiary presentation. Thus, in either case, pretrial discovery will become more extensive and wide ranging (if the plaintiff can afford it), for a much wider set of facts could prove to be both relevant and important at trial. The majority's scheme, therefore, will promote longer trials and more pretrial discovery, threatening increased expense and delay in Title VII litigation for both plaintiffs and defendants, and increased burdens on the judiciary.

In addition to its unfairness and impracticality, the Court's new scheme, on its own terms, produces some remarkable results. Contrary to the assumption underlying the *McDonnell Douglas* framework, that employers will have "*some* reason" for their hiring and firing decisions, see *Furnco, supra,* at 577 (emphasis in original), the majority assumes that some employers will be unable to discover the reasons for their own personnel actions. See *ante*, at 513. Under the majority's scheme, however, such employers, when faced with proof of a prima facie case of discrimination, still must carry the burden of producing evidence that a challenged employment action was taken for a nondiscriminatory reason. *Ante*, at 506–507, 509. Thus, if an employer claims it cannot produce any evidence of a nondiscriminatory reason

for a personnel decision,[12] and the trier of fact concludes that the plaintiff has proven his prima facie case, the court must enter judgment for the plaintiff. *Ante*, at 510, n. 3. The majority's scheme therefore leads to the perverse result that employers who fail to discover nondiscriminatory reasons for their own decisions to hire and fire employees not only will

---

[12] The Court is unrealistically concerned about the rare case in which an employer cannot easily turn to one of its employees for an explanation of a personnel decision. See *ante*, at 513. Most companies, of course, keep personnel records, and such records generally are admissible under Rule 803(6) of the Federal Rules of Evidence. See, *e. g.*, *Martin* v. *Funtime, Inc.*, 963 F. 2d 110, 115–116 (CA6 1992); *EEOC* v. *Alton Packaging Corp.*, 901 F. 2d 920, 925–926 (CA11 1990). Even those employers who do not keep records of their decisions will have other means of discovering the likely reasons for a personnel action by, for example, interviewing co-workers, examining employment records, and identifying standard personnel policies. The majority's scheme rewards employers who decide, in this atypical situation, to invent rather than to investigate.

This concern drives the majority to point to the hypothetical case, *ante*, at 513–514, of the employer with a disproportionately high percentage of minority workers who would nonetheless lose a Title VII racial discrimination case by giving an untrue reason for a challenged personnel action. What the majority does not tell us, however, is why such an employer must rely solely on an "antagonistic former employee," *ante*, at 514, rather than on its own personnel records, among other things, to establish the credible, nondiscriminatory reason it almost certainly must have had, given the facts assumed. The majority claims it would be a "mockery of justice" to allow recovery against an employer who presents "compelling evidence" of nondiscrimination simply because the jury believes a reason given in a personnel record "is probably not the 'true' one." *Ante*, at 514, n. 5. But prior to drawing such a conclusion, the jury would consider all of the "compelling evidence" as at least circumstantial evidence for the truth of the nondiscriminatory explanation, because the employer would be able to argue that it would not lie to avoid a discrimination charge when its general behavior had been so demonstrably meritorious. If the jury still found that the plaintiff had carried his burden to show untruth, the untruth must have been a real whopper, or else the "compelling evidence" must not have been very compelling. In either event, justice need not worry too much about mockery.

benefit from lying,[13] but must lie, to defend successfully against a disparate-treatment action. By offering false evidence of a nondiscriminatory reason, such an employer can rebut the presumption raised by the plaintiff's prima facie case, and then hope that the factfinder will conclude that the employer may have acted for a reason unknown rather than for a discriminatory reason. I know of no other scheme for structuring a legal action that, on its own terms, requires a party to lie in order to prevail.

Finally, the Court's opinion destroys a framework carefully crafted in precedents as old as 20 years, which the Court attempts to deflect, but not to confront. The majority first contends that the opinions creating and refining the *McDonnell Douglas* framework consist primarily of dicta, whose bearing on the issue we consider today presumably can be ignored. See *ante*, at 515. But this readiness to disclaim the Court's considered pronouncements devalues them. Cases, such as *McDonnell Douglas*, that set forth an order of proof necessarily go beyond the minimum necessary to settle the narrow dispute presented, but evidentiary frameworks set up in this manner are not for that reason subject to summary dismissal in later cases as products of mere dicta. Courts and litigants rely on this Court to structure lawsuits based on federal statutes in an orderly and sensible manner, and we should not casually abandon the structures adopted.

---

[13] As the majority readily admits, its scheme places any employer who lies in a better position than the employer who says nothing. *Ante*, at 521–522. Under *McDonnell Douglas* and *Burdine*, an employer caught in a lie will lose on the merits, subjecting himself to liability not only for damages, but also for the prevailing plaintiff's attorney's fees, including, presumably, fees for the extra time spent to show pretext. See 42 U. S. C. § 2000e–5(k) (1988 ed., Supp. III) (providing for an award of a "reasonable attorney's fee" to the "prevailing party" in a Title VII action). Under the majority's scheme, the employer who is caught in a lie, but succeeds in injecting into the trial an unarticulated reason for its actions, will win its case and walk away rewarded for its falsehoods.

Because the Court thus naturally declines to rely entirely on dismissing our prior directives as dicta, it turns to the task of interpreting our prior cases in this area, in particular *Burdine.* While acknowledging that statements from these earlier cases may be read, and in one instance must be read, to limit the final enquiry in a disparate-treatment case to the question of pretext, the Court declares my reading of those cases to be "utter[ly] implausib[le]," *ante,* at 513, imputing views to earlier Courts that would be "beneath contempt," *ante,* at 518, n. 7. The unlikely reading is, however, shared by the Solicitor General and the Equal Employment Opportunity Commission, which is charged with implementing and enforcing Title VII and related statutes, see Brief for United States et al. as *Amici Curiae* 1–2, not to mention the Court of Appeals in this case and, even by the Court's count, more than half of the Courts of Appeals to have discussed the question (some, albeit, in dicta). See *ante,* at 512–513. The company should not be cause for surprise. For reasons explained above, *McDonnell Douglas* and *Burdine* provide a clear answer to the question before us, and it would behoove the majority to explain its decision to depart from those cases.

The Court's final attempt to neutralize the force of our precedents comes in its claim that *Aikens* settled the question presented today. This attempt to rest on *Aikens* runs into the immediate difficulty, however, that *Aikens* repeats what we said earlier in *Burdine:* the plaintiff may succeed in meeting his ultimate burden of persuasion "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Aikens,* 460 U. S., at 716 (quoting *Burdine,* 450 U. S., at 256). Although the *Aikens* Court quoted this statement approvingly, the majority here projects its view that the latter part of the statement is "problematic," *ante,* at 519, arguing that the next sentence in *Aikens* takes care of

the "problem." The next sentence, however, only creates more problems for the majority, as it directs the District Court to "decide *which party's* explanation of the employer's motivation it believes." 460 U. S., at 716 (emphasis supplied). By requiring the factfinder to choose between the employer's explanation and the plaintiff's claim of discrimination (shown either directly or indirectly), *Aikens* flatly bars the Court's conclusion here that the factfinder can choose a third explanation, never offered by the employer, in ruling against the plaintiff. Because *Aikens* will not bear the reading the majority seeks to place upon it, there is no hope of projecting into the past the abandonment of precedent that occurs today.

I cannot join the majority in turning our back on these earlier decisions. "Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). It is not as though Congress is unaware of our decisions concerning Title VII, and recent experience indicates that Congress is ready to act if we adopt interpretations of this statutory scheme it finds to be mistaken. See Civil Rights Act of 1991, 105 Stat. 1071. Congress has taken no action to indicate that we were mistaken in *McDonnell Douglas* and *Burdine*.

\* \* \*

The enhancement of a Title VII plaintiff's burden wrought by the Court's opinion is exemplified in this case. Melvin Hicks was denied any opportunity, much less a full and fair one, to demonstrate that the supposedly nondiscriminatory explanation for his demotion and termination, the personal animosity of his immediate supervisor, was unworthy of credence. In fact, the District Court did not find that personal animosity (which it failed to recognize might be racially moti-

vated) was the true reason for the actions St. Mary's took; it adduced this reason simply as a possibility in explaining that Hicks had failed to prove "that the crusade [to terminate him] was racially rather than personally motivated." 756 F. Supp. 1244, 1252 (ED Mo. 1991). It is hardly surprising that Hicks failed to prove anything about this supposed personal crusade, since St. Mary's never articulated such an explanation for Hicks's discharge, and since the person who allegedly conducted this crusade denied at trial any personal difficulties between himself and Hicks. App. 46. While the majority may well be troubled about the unfair treatment of Hicks in this instance and thus remands for review of whether the District Court's factual conclusions were clearly erroneous, see *ante,* at 524–525, the majority provides Hicks with no opportunity to produce evidence showing that the District Court's hypothesized explanation, first articulated six months after trial, is unworthy of credence. Whether Melvin Hicks wins or loses on remand, many plaintiffs in a like position will surely lose under the scheme adopted by the Court today, unless they possess both prescience and resources beyond what this Court has previously required Title VII litigants to employ.

Because I see no reason why Title VII interpretation should be driven by concern for employers who are too ashamed to be honest in court, at the expense of victims of discrimination who do not happen to have direct evidence of discriminatory intent, I respectfully dissent.