**Neville DAWKINS, Plaintiff,**

v.

**WITCO CORPORATION, Defendant.**

**No. 99 Civ. 6079 CM LMS.**

United States District Court,
S.D. New York.

June 19, 2000.

Neville Dawkins, Bronx, NY, plaintiff pro se.

Kenneth A. Margolis, Laura Sack, Kauf, McClain & McGuire, LLP, New York City, for defendant.

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff brought claims under 42 U.S.C. §§ 1981 and 1983, Title VII, 42 U.S.C. § 2000e *et seq.*, The Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), (the "ADEA") and § 296 of the Executive Law of the State of New York against his former employer, Witco Corporation. On January 10, 2000, this Court granted Defendant's motion to dismiss the first two counts of the complaint. *See* Memorandum Decision and Order, 99 Civ. 6079 (S.D.N.Y. Jan. 10, 1999) (McMahon, J.). Defendant now moves for summary judgment and dismissal of the remaining claim. For the reasons stated below, the motion is granted.

## I. FACTS

The following facts are undisputed, except where noted:

Plaintiff Neville R. Dawkins, an African–American, became a lab assistant at the chemical laboratory facility Tarrytown New York facility of Witco's predecessor in 1977. In or about 1991, Dawkins was promoted to Senior Lab Technician. In 1996, Witco Corporation (the "Company") acquired successor interest in the Tarrytown facility and became Dawkins' employer. Over the course of his first twenty years at the Company, Plaintiff received generally satisfactory performance reviews for his work. (*See* Plaintiff's Opp., Exhs. A–1 through A–8; B–1, B–2.) Some of his reviews indicated that his performance could be improved. (See Plaintiff's Opp. Exh. B–4; Exh. D–1.)

In 1997, Dawkins was working as the Senior Lab Technician in the Organosilicones Group when he applied for promotion to the Chemist I position in the Company's Performance Chemicals Group. Plaintiff was interviewed by Dr. Ib Bechara and Dr. Ross Armbrecht, neither of whom had previously met or worked with Plaintiff. Drs. Bechara and Armbrecht decided to hire Plaintiff as Chemist I, and in November 1997, he began work in that

job, reporting to Dr. Bechara.[1] As part of the job change, Plaintiff received a salary increase.

## A. *The Company's Safety Requirements*

By his own testimony, Plaintiff was aware that safety was an important part of his job responsibilities. (Dawkins Dep. at 74.) The Company emphasized the central role of safe laboratory operations, and Plaintiff admitted that he attended safety training sessions on a regular basis throughout the course of his employment. (*Id.* at 269–73, 291.) Plaintiff was acquainted with the safety manual maintained at the Company's Tarrytown facility, at least one hard copy of which was available to employees in a common area of the building. The safety manual is "a huge, maybe about three or four-inch binder that contains all the safety instructions for the laboratory." (Dawkins Dep. at 74.) One of the topics covered in the safety manual was the specific procedure to be followed to safely dispose of hazardous chemical waste. (Dawkins Dep. at 282–83; Dawkins Dep.Exh. 14.)

It is also undisputed that Plaintiff was familiar with the Company's Safety Policy, which specifies that "safety is unequivocally our number one (# 1) priority," and that "We are all accountable for ourselves and the safety of others in the workplace. *Working safely is condition of employment.*" (Dawkins Dep. at 272–75; Dawkins Dep. at Exh. 11) (emphasis added). As evidence of the Company's strong emphasis on safety in the workplace, in 1996 and 1997, all Company employees, including Plaintiff, received annual performance appraisals based partly on their demonstrated ability to "practice [ ] safe and environmentally sound work habits and influence [ ] others to work safely and in an environmentally conscious manner." (Dawkins Dep.Exhs. 7, 27.)

The Company's Code of Business Conduct, which Plaintiff received, reviewed and signed on April 23, 1996, contains a section entitled "Workplace Safety," which reads in part:

> Employees are expected to implement all work practices taught in company-sponsored education and training programs to prevent personal injury and property loss, and are required to comply with all company policies and applicable health and safety laws. *Employees should immediately report all potential or actual health or safety problems to supervisors, the Safety, Health & Environmental Affairs Department, of the Legal Department.*

(Dawkins Dep. at 288–90; Dawkins Dep. Exhs. 16, 17.) (emphasis added).

## B. *The Spill*

On the afternoon of January 26, 1998, a spill occurred in the laboratory Plaintiff shared with the scientist, Dr. John Xu, who is Asian. According to Plaintiff's testimony, the spill resulted from Dr. Xu's effort to prepare a potassium hydroxide solution for soaking soiled laboratory glassware. Potassium hydroxide solution is an extremely dangerous, highly reactive, caustic substance that should only be prepared in a stainless steel container. If prepared in an aluminum container, a reaction will commence "almost immediately" and the chemical solution will quickly eat through the container. (Dawkins Dep. at 147, 149; Bechara Dep. at 43, 45–47.) Plaintiff, who testified that he was on the phone at the time the spill occurred, observed Dr. Xu standing over the fume hood in the lab, where a container that "looked as though it was an aluminum bucket container" was filled with liquid that foamed over the top of the container on the floor of the hood. (Dawkins Dep. at 143–144, 160.) Plaintiff further testified that Dr. Xu told him that the container was aluminum "during the time it was foaming over the top." (*Id.* at 164–65.)

---

1. Dr. Bechara reported to Dr. Armbrecht.

Plaintiff described the reaction between the potassium hydroxide solution and the aluminum bucket in this way:

It [the aluminum bucket] wasn't readily recognizable, because from all the fume and all the chemicals that were still present there. So but what I could observe is the bottom there was a reaction, the reaction with the aluminum and the potassium hydroxide and water. The bottom had all dissolved and eaten away, so instead of it foaming at the top, it was running out from the bottom now.

(Dawkins Dep. at 164.)

Plaintiff and Dr. Xu worked together to contain the spill by mopping up the overflowing liquid with papers towels and an absorbent material known as "pig."

Once the spill was contained, Plaintiff, with Dr. Xu's assistance, placed the resulting waste—the aluminum bucket that had reacted with the solution and the absorbent and paper towels which they had used to absorb the same reactive solution into an "ordinary cardboard box." (Dawkins Dep. at 165–66.) Plaintiff closed the flaps on the cardboard box, left the box on the floor of the lab, and went home for the day. Plaintiff testified that he could not recall whether he had labeled the box, but stated that he intended to "dispose of it in the proper fashion" the following morning, by "get[ting] the proper container to put the disposable stuff in there and label[ling] it." (Dawkins Dep. at 176–79.) There is no evidence in the record that Plaintiff made any effort to advise Dr. Bechara or anyone else about the spill, the subsequent clean-up effort, or the fact that a cardboard box containing hazardous waste was left to sit on the floor of his lab unattended overnight.

That evening, smoldering materials were discovered in a dumpster located at the rear entrance to the lab building. These materials, which were confined to a cardboard box in the dumpster, and which appeared to the person who removed them from the dumpster that evening to have been used to clean up a spill of a caustic solution, included a large aluminum kettle packed with soaked paper towels, a smaller metal container containing a white "gooey" material, an assortment of paper towel containers with soaked papers towels, and pig absorbent pads.

When plaintiff arrived at this lab early the next morning, the cardboard box was gone. Plaintiff did not tell anyone that the box was missing. When asked at his deposition why he failed to tell anyone the box was missing, Plaintiff replied, "There is no reason." (Dawkins Dep. at 194.)

Plaintiff initially testified that it was not until around 10:30 a.m. on the morning of January 27, after Thomas Hunter sent an e-mail to all personnel discussing the fire and asking for those responsible to come forward (Dawkins Dep.Exh. 9), that he became aware that there had been a fire or smoke condition in the garbage dumpster outside the rear entrance to the facility the prior evening. (Dawkins Dep. at 196.) Upon further questioning, however, Plaintiff admitted that earlier that morning, Dr. Kenrick Lewis "told me that there was a spill in one of the laboratories. I think he asked me specifically to find out which lab it was that the spill occurred." (Dawkins Dep. at 198–99, 242.)[2] Plaintiff did not volunteer any information to Dr. Lewis nor did he respond in any way to Lewis' request to find out where the spill occurred. Plaintiff explained that he did not say anything to Dr. Lewis because he did not know what Lewis' motives were in asking the question and, in any event, Plaintiff reported to Dr. Bechara, not Dr. Lewis. However, Plaintiff admitted that following this conversation with Dr. Lewis, he did not try to reach Dr. Bechara to tell him about the spill. Nor did he tell Dr. Xu about Dr. Lewis' inquiry about the spill.

**2.** Dr. Lewis, an African–American, has been an employee at the facility for over 21 years. Plaintiff admitted in his deposition that he was not concerned that Dr. Lewis would discriminate against him because of his (Plaintiff's) race. (Dawkins Dep. at 204.)

Later that day, Dr. Bechara convened a meeting of his subordinates and asked whether any of them had a lab spill. Plaintiff revealed, for the first time, that there had been a spill in his lab. That afternoon, Plaintiff was asked to meet individually with Dr. Bechara and Dr. Armbrecht. Drs. Bechara and Armbrecht also met with Dr. Xu as part of their investigation of the spill. In the course of these meetings, both Plaintiff and Dr. Xu admitted that they had cleaned up the spill with absorbent materials, they placed both the absorbent materials (soaked with potassium hydroxide) and the badly corroded aluminum container in a cardboard box. (Dawkins Dep. at 221–23; Bechara Dep. at 51, 61, 83.) At the conclusion of both meetings, both Plaintiff and Dr. Xu were instructed to go home until they were contacted by the Company.

## C. Decision to Discharge Plaintiff and Dr. Xu

Drs. Armbrecht and Bechara made the decision to discharge Plaintiff and Dr. Xu after consultation with other Company officials. As Dr. Bechara explained, the decision to terminate the Plaintiff was based on several factors:

one reason was that he disposed of waste—of hazardous waste improperly. Another reason, he did not come forth and notify anybody about it, neither me nor any safety managers, and number three, him [sic] and his coworker tried to cover the incidents, a very serious incident, and fourthly, there was an E-mail soliciting or asking if anyone knew about the incident and he did not come forth and neither of them came forth and answered the E-mail, so there was attempt to cover-up for sure. There was a very serious safety violation that could

have caused damage and hazards to individuals as well as to property.

(Bechara Dep. at 30–31.)

Dr. Xu was terminated for the same reasons. (Id. at 50.)

At separate meetings on January 29, 1999, Dr. Bechara informed Plaintiff and Dr. Xu that their employment with the Company was terminated as a direct consequence of their deliberate effort to cover up a very serious safety violation.

## D. The Complaint

On February 18, 1998, Plaintiff filed a complaint against Witco for alleged race and age discrimination with the New York State Department of Human Rights. At that time, Plaintiff was represented by counsel, Attorney Mitchell Weingarden. On May 27, 1999, plaintiff received a right to sue letter from the EEOC. On June 1, 1999, the New York SDHR informed Plaintiff that, in light of the right to sue letter, it intended to dismiss the complaint against the Defendant.

Upon receiving the right to sue letter, Plaintiff retained Attorney Carolyn Minter to represent him. This suit was filed on September 28, 1999 and included civil rights claims under the Thirteenth and Fourteenth Amendments, 42 U.S.C. §§ 1981 and 1983, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and § 296 of the New York Executive Law.

On January 10, 2000, the Court granted Witco's motion to dismiss the first and section causes of action, which included the constitutional and §§ 1981 and 1983 claims, on the grounds that Witco is a private employer.[3] On January 14, 2000, Plaintiff decided to discharge Attorney Minter and proceed pro se. The Court

---

**3.** On September 29, 1999, Defense counsel wrote to Plaintiff's counsel informing her that the equal protection and due process claims were wholly insupportable and frivolous, and insisting that an amended pleading be served promptly. Attorney Minter finally amended the complaint on October 29, 1999, but neglected to remove the frivolous constitutional claims. For her failure to amend the complaint, as she had promised to do, this Court sanctioned Attorney Minter.

granted Plaintiff permission to proceed pro se.

## II. DISCUSSION

Defendant now moves for summary judgment seeking dismissal of the remaining claims of the Amended Complaint. Because I find that Plaintiff has failed to raise an issue of material fact that he was dismissed because of his age or race, Defendant's motion is granted.

### A. *Standard*

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a Plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985) *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

In my order dated February 1, 2000, I instructed Plaintiff that he was required to file a Local Rule 56.1 statement, and that his failure to comply with the rule would result in dismissal of his case. Plaintiff has failed to file a Local Rule 56.1 statement. However, Plaintiff has submitted a signed statement, in which he discusses Defendant's arguments the facts on which

Defendant relies to support its motion for summary judgment. In the interests of justice, I will treat as this statement as complying with the local rule and my explicit order. To the extent that Plaintiff's statement does not raise objections to Defendant's 56.1 statement, I accept the allegations of Defendant's 56.1 statement as true. *See Commercial Union Ins. Co. v. M.V. Bremen Express,* 16 F.Supp.2d 403, 409 (S.D.N.Y.1998).

The order and allocation of proof in employment discrimination cases is well established:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). It thus remains the plaintiff's burden, on summary judgment, to raise an issue of material fact that he was terminated from his employment on the basis of age or race. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *McDonnell*

*Douglas,* 411 U.S. at 804, 93 S.Ct. 1817; *Hicks,* 509 U.S. at 502, 113 S.Ct. 2742.

, To state a prima facie case, Plaintiff must show that (1) he was a member of the protected class, (2) he was qualified for his job, and (3) he was nevertheless discharged from the job under circumstances giving rise to an inference of discrimination. *See Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. 1089. To demonstrate that he was qualified for the job, a plaintiff must show that he was qualified for the position at the time of the discharge, regardless of whether he had performed the position satisfactorily in the past. *See Powell v. Syracuse Univ.,* 580 F.2d 1150, 1155 (2d Cir.) *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (to establish the second prong of his *prima facie* case, plaintiff must show that "his performance was of sufficient quality to merit continued employment.") (quoting *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1283 (7th Cir.1977)).

Defendant does not dispute that Plaintiff is African–American, and thus a member of a protected class. Nor does it dispute that Plaintiff was discharged at the age of 47. Defendant seeks summary judgment on the grounds that (1) at the time he was discharged, Plaintiff was not qualified for his job and (2) he was not discharged under circumstances giving rise to an inference of discrimination. Defendant is correct.

### B. *Plaintiff No Longer Qualified for Continued Employment*

Defendant argues that Plaintiff's actions and omissions in connection with the laboratory spill made him unqualified to do his job. First, despite his extensive knowledge of safety procedures and his awareness of the centrality of safe handling of hazardous wastes, Plaintiff admits that he knowingly failed to dispose properly the waste that resulted from Dr. Xu's error. Defendant also contends that Plaintiff's behavior following the accident—his refusal to acknowledge the spill when Dr. Lewis asked him about it the following morning, his failure to notify Drs. Xu or Bechara about Lewis' inquiry, and his failure to report the spill to anyone until he was asked about it later in the day—is evidence of his intentional violations of Company safety policies.

 Plaintiff argues in response that he was not personally responsible for the spill. He contends that, by assisting Dr. Xu with the clean-up, he was simply doing a good deed. However, as Defendant points out, the question of whether an employee is qualified for continued employment cannot be determined by the self-serving statements of the employee himself. *See, e.g., Pisana v. Merril Lynch & Co., Inc.,* No. 93 Civ. 4541, 1995 WL 438715, at *3 (S.D.N.Y. July 24, 1995) ("It is the perception of the decision-maker, not the plaintiff himself, which is relevant.") (quoting *Rosengarten v. J.C. Penney Co.,* 605 F.Supp. 154, 157 (E.D.N.Y. 1985)); *Walters v. Columbia Presbyterian Hosp.,* No. 89 Civ. 1326, 1990 WL 43932 at *5 (S.D.N.Y. April 9, 1990) ("with respect to proof of the claimant's qualifications ... to continue in his present position ... the testimony of the employee himself carries little weight.") (internal quotation omitted). Further, whether this Court believes that Dawkins remained qualified for continued employment following the spill is irrelevant to the determination. The Second Circuit has noted that "[w]hether job performance was satisfactory depends on the *employer's criteria* for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishing Inc.,* 104 F.3d 26, 29 (2d Cir.1997).

Plaintiff has placed nothing in the record to contradict Defendant's evidence of his failure to follow Company safety procedures. Because compliance with the safety policy was an explicit condition of his continued employment, no reasonable juror could conclude that Plaintiff continued to be qualified to serve as a chemist at

Witco. I thus find that Plaintiff has failed to satisfy the second prong.

### C. *Plaintiff Fails to Raise an Inference of Discrimination*

 Defendant is also correct that Plaintiff has failed to "describe specific actions by [Witco] 'that if unexplained, give rise to an inference of discriminatory conduct.'" *Burrell v. Bentsen*, No. 91 Civ. 2654, 1993 WL 535076, at *5 (S.D.N.Y. Dec.21, 1993) (quoting *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453). To meet this burden, Plaintiff must do more than merely proffer his own belief that he was discriminated against. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997) ("While [plaintiff] has testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination.") (citations omitted). Plaintiff has presented no evidence of specific actions by the Defendant that give rise to an inference of age or race-based discrimination.

The record contains no evidence that raises an inference of discrimination by Drs. Armbrecht or Bechara. Rather, Plaintiff himself testified that up until the date he was terminated, he had maintained a good relationship with both Armbrecht and Bechara. He was unable to cite any instance when either of them many any discriminatory remarks about anyone. Plaintiff could not cite in his testimony, and has presented no evidence to this Court, of instances when white employees were treated any differently than he.[4] Nor has he placed any evidence in the record that employees below the age of 40 were treated differently.

Instead, Plaintiff avers to three occasions during the 21 years of his employment at Witco when he was subjected to racially offensive remarks and behavior.

(*See* Plaintiff's Mem. at pp. 3–4.) None of these incidents is relevant to determining whether Drs. Armbrecht and Bechara terminated Plaintiff because of his age and/or race. Even assuming Plaintiff's averments about the incidents to be true, there is no evidence in the record that these remarks—made by co-workers and supervisors in the early 1990s—had anything to do with Plaintiff's work environment after 1997, when he was promoted and transferred to the job in the Organosilicones Group.

Plaintiff has simply failed to raise an issue of fact that similar situated white employees, or similarly situated employees who were younger than he, were treated differently when found to have engaged in violations of the Company's safety guidelines. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60 (2d Cir.1997). Absent such evidence, Plaintiff fails to satisfy the third prong.

### D. *Non–Discriminatory Basis for the Dismissal*

 Although I need not reach this issue, Plaintiff's claim of age and race discrimination fails on the additional ground that Witco has put forward a non-discriminatory basis for Plaintiff's dismissal, namely, that he violated safety procedures in his disposal of the hazardous waste and failed to report the spill in a timely manner as required by Company guidelines. While Plaintiff views his assistance to Dr. Xu as "an act of kindness toward another human being" (Plaintiff's Mem. at 4), the evidence is undisputed that the attempts to contain the spill, the failure to dispose of the resulting waste according to the required guidelines, and the failure to report the spill (to the point of covering up when he knew his supervisors were looking into the matter) violated Company policy. Because Plaintiff has failed to show that the prof-

---

**4.** Defendant argues that because Dr. Xu, who is Asian, was terminated for the same reason as Dawkins, Dawkins cannot argue that other employees similarly situated were treated differently. However, the proper standard is not how other minority employees were treated, but rather how similarly situated white employees were treated. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 208, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

fered reasons for firing him are pretextual, his claim must fail. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

E. *State Law Claims*

The standards applied by courts evaluating age and race discrimination claims under the New York State Human Rights Law are parallel to the analysis used in Title VII and ADEA claims. *See Cruz v. Coach Stores,* 202 F.3d 560, 565 (2d Cir.2000); *Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1 (2d Cir.1999). For the reasons discussed above, I find that Plaintiff has failed to make a prima facie showing of discrimination under the New York State Human Rights Law, and dismiss the state law claims against Defendant.

### III. CONCLUSION

Mr. Dawkins appears not to be a victim of either race or age discrimination, but of his own poor judgment in dealing with a hazardous spill in his laboratory. As unsatisfactory as the Plaintiff may find this result, neither Title VII nor the ADEA makes it unlawful for employers to make harsh decisions. The law prohibits them from taking actions that discriminate against people on the basis of race or age. On this record, there is no evidence of such discrimination.

I therefore grant the Defendant's motion for summary judgment and dismiss all the claims against it.

This constitutes the decision and order of the Court.