Adell P. **ALLEN**, Plaintiff,

v.

**ST. CABRINI NURSING HOME, INC.**, Defendant.

No. 00CIV.8558(CM)(LMS).

United States District Court, S.D. New York.

April 11, 2002.

444

Adell Allen, Plaintiff Pro Se, Mt. Vernon.

Jeffrey Collazo, Esq., New York.

McMAHON, District Judge.

On November 8, 2000, plaintiff filed the instant federal court Complaint against St. Cabrini Nursing Home ("St. Cabrini" or the "Nursing Home"), alleging violations of Title VII in St. Cabrini's termination of her employment. Plaintiff alleged that St. Cabrini retaliated against her, failed to promote her; provided her with (unspecified) unequal terms and conditions of employment; harassed her; and discriminated against her based on sex; plaintiff also alleged tort claims for harassment and defamation. By decision and order of March 9, 2001, this Court dismissed all of plaintiff's claims except for her retaliation claim. The parties completed discovery on plaintiff's retaliation claim on October 18, 2001, and defendant immediately moved for summary judgment dismissing plaintiff's one remaining cause of action.

That motion is granted.

Plaintiff *admits* that she was fired from her job at Cabrini for repeatedly refusing to cooperate in the Nursing Home's investigation of a Resident's injury. Plaintiff's sole support for her retaliation claim consists of conclusory allegations of an elaborate conspiracy to persecute her, for which she offers no evidence whatsoever. Because plaintiff has failed either to make out a prima facie case of retaliation or to raise a genuine issue of material fact as to St. Cabrini's legitimate, non-discriminatory reason for firing her, the motion is granted and the Complaint dismissed.

**Statement of Undisputed Facts**

None of the following facts is in dispute.

Plaintiff began work at St. Cabrini as a Certified Nursing Assistant ("CNA") on August 11, 1997 (56.1 Statement, ¶¶ 1, 2). As a CNA, plaintiff's position required her to administer non-professional care and perform routine tasks under the supervision of a nurse (56.1 St. ¶ 3). In particular, plaintiff was responsible for feeding, grooming, dressing, and transporting nursing home residents, as well as assisting residents with personal hygiene, responding to resident calls for assistance, and monitoring residents' temperature, weight, and fluid intake and output. *Id.* Plaintiff's position as CNA also required her to "report any observations of unusual manner or appearance" regarding the residents to whom she was assigned, including color, skin conditions, restlessness, and lethargy. *Id.* Plaintiff's position also required her to report any injuries she detected to the nurse in charge, and to take precautions, such as the use of side rails, to ensure the safety of nursing home residents. *Id.*

Plaintiff was assigned to work part-time on the weekend night shift, from 11 p.m. to 7 a.m. (56.1 St. ¶ 4). When Plaintiff reported to work on the night of February 28, 2000, she was assigned to the One West unit of the Nursing Home, and one of the residents assigned to her care was an elderly woman who will be identified herein as E.O. (56.1 St. ¶ 5). Plaintiff states that she left the floor at 7:15 a.m. on the morning of February 29, 2000 (56.1 St. ¶ 6). Plaintiff was relieved that morning by a CNA named Lilly James, whose shift began at 7 a.m. (56.1 St. ¶¶ 6, 7).

Shortly before 9:00 a.m. on February 29, 2000, Ms. James noticed that E.O.'s right leg was injured (56.1 St. ¶ 8). Ms. James immediately reported the injury to her nurse supervisor, licensed practical nurse Margaret ("Peggy") Kraft, who examined and dressed the wound (56.1 St. ¶¶ 8, 9). *Id.* Pursuant to nursing regulations and standard nursing home policy, Ms. Kraft prepared a Resident Incident Report at 9:05 a.m. describing E.O.'s injury (56.1 St. ¶ 10). When E.O.'s physician examined her the next day, he noted that the injury might be infected (56.1 St. ¶ 11). Pursuant to St. Cabrini procedures, Daytime Supervisor Lucille Smith, RN, began to collect written statements from the employees who had cared for Resident E.O. during the 24–hour period before the injury's discovery.[1] (56.1 St. ¶¶ 12, 13.) All employees except Ms. Allen cooperated in the investigation and submitted written statements documenting their observations of E.O.[2] *Id.*

When plaintiff reported to work the following evening, February 29, Sicily Jeremiah, RN, instructed plaintiff to complete a written statement documenting her care of Resident E.O. on the night of the injury (56.1 St. ¶ 14). In reply, plaintiff stated to Ms. Jeremiah that she had noticed a "healed up dry area" on one of the resident's legs, but did not remember which

leg, and stated that she did not report this to the nurse because "it look[ed] old." (56.1 St. ¶ 15). Plaintiff refused to provide a written statement, and refused to sign the summary Ms. Jeremiah prepared of their conversation, instead sarcastically threatening to call the FBI (56.1 St. ¶ 14, 15). During plaintiff's next scheduled shift on March 6, 2000, Ms. Theoret and union delegate Gloria Hamilton met with plaintiff, and plaintiff was directed a *second* time to comply with the investigation (56.1 St. ¶ 16).[3] Plaintiff refused to cooperate, however, instead stating, "I'll have to get a lawyer before I answer any questions" (56.1 St. ¶ 16). On March 9, 2000, Assistant Director of Nursing Velia Nappi suspended plaintiff pending further investigation for her refusal to cooperate in the investigation of E.O.'s injury (56.1 St. ¶ 17).

On March 15, 2000, in the presence of two union delegates, Director of Nursing Diane Patton met with plaintiff again and a *third* time directed her to cooperate with St. Cabrini's investigation of the resident's injury (56.1 St. ¶ 18). Plaintiff again refused to cooperate. *Id.* Accordingly, plaintiff's suspension was extended indefinitely, pending a further attempt to elicit her cooperation. *Id.*

---

1. Ms. Kraft cared for E.O. during the 7 a.m. shift on February 28, and prepared the incident report after the injury was discovered on February 29. Lorna Burnett also cared for E.O. on the 7 a.m. shift on February 28. Weeva Clarke and Alma Anderson cared for E.O. during the 3 p.m.—11 p.m. shift on February 28. Sheila Dent and plaintiff had cared for E.O. during the following 11 p.m.—7 a.m. shift. Each of these employees, except for plaintiff, submitted or dictated a written statement (56.1 St. ¶ 13).

2. Ms. Smith spoke only to the day-shift employees. Associate Director of Nursing Velia Nappi spoke to employees on the evening shift and left a note for Nursing Supervisor

Mary Kay Theoret, RN, to ask night shift employees, including plaintiff, about the incident (56.1 St. ¶ 12).

3. Ms. Theoret attempted to elicit plaintiff's answers to the following questions: "What time during the shift of February 29 did you care for the resident, [including] first time, last time, and all times in between?"; "Did you see bruises and abrasions on the resident's leg; if so, what time. Did you report [this] to the nurses?"; "How often did you change the resident?"; and "Did you notice that the left side-rail padding was missing?" (56.1 St. ¶ 16).

On March 17, 2000, St. Cabrini's Director of Human Resources, Richard Schneiderman, instructed plaintiff to meet with Ms. Patton in order to discuss what she knew of E.O.'s injury, and advised plaintiff that failure to do so would result in immediate termination (56.1 St. ¶ 19). By letter of March 24, 2000, plaintiff declined this *fourth* opportunity to comply with her employer's instructions and satisfy her responsibilities as a CNA at St. Cabrini, and instead declared that the incident with Resident E.O. was "fictitious" (56.1 St. ¶ 20). On March 28, 2000, Mr. Schneiderman terminated plaintiff's employment.(56.1 St. ¶ 21). No other employee, in the collective experience of Mr. Schneiderman, Ms. Patton, and Ms. Nappi, has ever refused to cooperate in such an investigation (56.1 St. ¶ 22).

Plaintiff alleges that on December 10, 1998 (over 15 months before her employment was terminated), she submitted a letter to Margaret Marbury, who was then the Acting Director of Nursing and is now the Director of Quality Control and Accreditation at St. Cabrini (56.1 St. ¶ 26), complaining of purported discrimination in that she was allegedly denied the opportunity to work five extra hours. She asserts that she was fired because of this letter, rather than for her refusal to cooperate with the Nursing Home's investigation (56.1 St. ¶ 26). No one in St. Cabrini's management, including Marbury, has any record or recollection of receiving such a document at any time, or any complaint of discrimination from plaintiff whatsoever[4] (56.1 St. ¶ 27, 28, 29). None of the individuals involved in the discipline and termination of plaintiff (Mr. Schneiderman, Ms. Patton, and Ms. Nappi) was employed at St. Cabrini as of the date of the alleged letter (56.1 St. ¶ 28). Achamma Matthews, the only individual mentioned in plaintiff's December 1998 letter, did not participate in the investigation of E.O.'s injury, and participated in plaintiff's discipline only to the extent of carrying out Ms. Nappi's instructions (56.1 St. ¶¶ 37).

Plaintiff has produced no evidence whatsoever of retaliatory intent. She admits that she did not hear any discriminatory remarks during her employment at St. Cabrini, and also admits that she heard no remarks at any point during her employment that would suggest that the decision to terminate her employment was motivated by retaliation (56.1 St. ¶ 32). Subsequent to her alleged submission of the December, 1998 letter, plaintiff cooperated in an internal investigation of an injury suffered by another Nursing Home Resident (Resident H.M.). That investigation took place in April 1999. In the course of this investigation, plaintiff submitted a written statement stating that she knew nothing about H.M.'s injury. This statement was satisfactory to her supervisors (56.1 St. ¶ 31). Plaintiff offers no explanation of why her employer would allegedly pass up one opportunity to retaliate against her, and wait 10 additional months for its next alleged opportunity.

At no point was plaintiff ever accused of deliberately injuring Resident E.O. (56.1 St. ¶ 23). St. Cabrini ultimately concluded that E.O. probably incurred her injury when her leg became wedged between her bed's mattress and side railing (56.1 St. ¶ 24). Aside from her conclusory allegation, plaintiff offers no evidence tending to show that anyone at St. Cabrini ever held her responsible for E.O.'s injury.

---

4. St. Cabrini first received a copy of this letter as an attachment to plaintiff's affidavit opposing its motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). Although plaintiff's EEOC Charge cites this December 10, 1998 letter as an attachment, no such document is attached to the charge. (56.1 St. ¶ 30).

448

## Conclusions of Law

### NO GENUINE ISSUE OF MATERIAL FACT EXISTS TO SUPPORT PLAINTIFF'S RETALIATION CLAIM

Summary judgment is appropriate where the parties' submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). For plaintiff to defeat summary judgment, she must offer "concrete particulars" to substantiate the claim; she may not merely rely on the pleadings or raise solely metaphysical doubt as to the material facts. *Dawkins v. Witco Corp.*, 103 F.Supp.2d 688, 695 (S.D.N.Y.2000). Speculation, conclusory allegations, unsupported assertions, and mere denials are not enough to raise genuine issues of fact; to avoid summary judgment, plaintiff must produce enough evidence that a jury could return a verdict in her favor. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *Ofudu v. Barr Labs., Inc.*, 98 F.Supp.2d 510, 513–14 (S.D.N.Y.2000).

A. *Analytical Framework for Title VII and New York Human Rights Law Retaliation Claims*

To establish a prima facie case of retaliation, plaintiff must prove that: (1) she participated in a protected activity; (2) her employer was aware of this activity; (3) her employer adopted an employment action adverse to plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998). Courts apply the same standard of proof to retaliation claims under Title VII and the New York Human Rights Law. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir.1997).

If plaintiff meets this burden, the burden of production then shifts to the employer to offer a legitimate, nondiscriminatory reason for its actions. *Quinn, supra,* at 768. Plaintiff must then prove that the employer's proffered reason is false, and merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Where, as in this case, the employer provides convincing evidence to explain its conduct, and plaintiff's argument consists of purely conclusory allegations of retaliation, the Court may conclude that no material issue of fact exists and grant summary judgment for the employer. *Ofudu, supra,* at 516.

Although St. Cabrini does not dispute that it terminated plaintiff's employment on March 28, 2000, and that plaintiff performed her job adequately prior to the misconduct that led to her termination, plaintiff's complaint must be dismissed because the evidence she offers does not, as a matter of law, demonstrate any nexus between her December 1998 complaint of discrimination and her termination fifteen months later.

Defendant urges this Court to conclude, as a matter of undisputed fact, that no one at St. Cabrini received the December 1998 letter. I decline to do so. For purposes of this motion, I will assume that things happened as plaintiff contends: she sent the letter to Maybury in December 1998.

Furthermore, for purposes of this motion, I will assume that the letter constituted protected activity under Title VII, despite Defendant's persuasive argument to the contrary. It is true, as Defendant alleges, that Plaintiff's claim of being bumped from a weekend shift on one occasion—an act that deprived plaintiff only of the opportunity to work five extra hours (which would have amounted to $62.47) (See 56.1 St., Ex. 28)—does not constitute

an unlawful employment practice, such that complaining about it would qualify as protected activity under Title VII. The courts in this circuit have consistently held that mere scheduling inconveniences do not constitute an adverse employment action absent a materially significant change in plaintiff's employment. *Neratko v. Frank*, 31 F.Supp.2d 270, 289 (W.D.N.Y. 1998) (collecting cases finding undesirable scheduling not an adverse employment action). *See also Katz v. Beth Israel Medical Center*, 2001 WL 11064, 2001 U.S. Dist. LEXIS 29, * 44 (S.D.N.Y. Jan. 4, 2001) (receiving unfavorable schedules or work assignments, being told to retire or work part time if plaintiff disliked schedule did not constitute adverse employment actions). Here, the inconvenience at issue was apparently for one night only. Plaintiff testified at her deposition that her opportunities to work overtime actually *increased* after December 1998; that she benefitted from those opportunities; that she worked more overtime than any other St. Cabrini employee; and that she never felt compelled to work overtime when she found it inconvenient (56.1 St. ¶ 34). Indeed, although plaintiff's base salary was $9,745 annually (plaintiff was scheduled to work 15 hours per week at $12.4943 per hour), it is undisputed that plaintiff requested, and received, numerous additional hours, allowing her to earn $22,466.85 in 1998, and $43,531.60 in 1999—*after* she allegedly submitted her letter (56.1 St. ¶ 33). In light of the quantity of additional working time plaintiff was offered in 1998, the purported loss of the opportunity to work five extra hours ($62.47), as set forth

in plaintiff's December, 1998 letter, hardly rises to the level of an adverse employment action. *Cf. Fridia v. Henderson,*, 2000 WL 1772779, 2000 U.S. Dist. LEXIS 17295, *21–24 (S.D.N.Y. Nov. 30, 2000) (denials of requests for leave with pay for one day and four days do not rise to the level of an adverse employment action because they do not materially change the terms, conditions, or privileges of employment). Thus, plaintiff could not have entertained a good faith, reasonable belief that her supervisor's decision to deny her five extra hours of work was unlawful under Title VII. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001) (where the complained-of conduct does not in fact violate Title VII, the employee's belief that it does must be "objectively reasonable; isolated or minor instances of alleged mistreatment do not satisfy this standard.." *Breeden* at 1509–10).[5]

Despite this persuasive argument, I will give the *pro se* plaintiff the benefit of every doubt on this motion, and assume (without finding) that she engaged in protected activity under Title VII by sending the December 1998 letter. She nonetheless loses because she has not offered any evidence tending to suggest that the letter had any bearing on her termination over fifteen months later.

■■ To establish a prima facie case of retaliation, plaintiff must establish a causal connection between a protected activity and her adverse employment action. *Clarke v. City of New York*, 2001 WL

---

**5.** Moreover, plaintiff had no reason to believe she lost the opportunity to work five extra hours for racially discriminatory reasons: certainly, plaintiff's December 1998 letter sets forth no such grounds (56.1 St. Ex. 28). Plaintiff admitted that she was never the victim of any offensive remarks, and she has not

offered any other evidence of racial animus (56.1 ·St. ¶ 32). At her deposition, plaintiff stated that her only reason for believing this alleged schedule change was racist was her belief that no other St. Cabrini employee had suffered the same apparent inconvenience that she had (56.1 St. Ex. 5).

876926, 2001 U.S. Dist. LEXIS 11136, *18 (S.D.N.Y. Aug. 1, 2001). Causation may be proved by showing that the retaliatory action was close in time to the protected activities; that other similarly situated employees were treated differently; or by offering direct proof of retaliatory animus. *Id.* at *18–19, 2001 WL 876926. Plaintiff's claim of retaliation fails because she offers no evidence whatever of a causal nexus.

A substantial time lag between the protected activity and the adverse employment action suffices to defeat an inference of retaliatory animus. Claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84–85 (2d Cir.1990); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y.1999); *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 435 (S.D.N.Y.1998); *Zenni v. Hard Rock Cafe Int'l Inc.*, 903 F.Supp. 644, 656 (S.D.N.Y.1995). In the instant case, nearly 16 months elapsed between the date of plaintiff's alleged letter and her termination. The prolonged delay between plaintiff's alleged protected activity and her adverse employment action defeats her claim that the two events were causally related. The fact that plaintiff was asked to cooperate in an investigation during that sixteen month hiatus—and did so—is a further break in the causal chain. So is the fact that the persons who decided to fire her were not the recipients of the December 1998 letter, and indeed, were not even on the staff at St. Cabrini in December 1998.[6]

Second, plaintiff cannot create an inference of retaliation through comparison with similarly situated employees, because there are none: the misconduct that gave rise to plaintiff's termination (her refusal to cooperate in St. Cabrini's investigation of a resident's injury) was so egregious that Defendant has no record of its happening before (56.1 St. ¶ 22). Where plaintiff's Title VII claim purportedly arises from a disciplinary action, other employees are deemed similarly situated to plaintiff only where they are subject to the same workplace standards and have been disciplined for conduct of comparable seriousness. *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000). Because plaintiff does not identify another St. Cabrini employee who received lighter discipline than she after failing to cooperate with an investigation, she is unable to rely on the comparison of her situation to that of any similarly situated employees.

Third, as noted above, plaintiff offers no direct evidence of retaliatory intent. Plaintiff admits that she never heard any discriminatory remarks or remarks that would suggest retaliatory intent (56.1 St. ¶ 32). Instead, plaintiff speculates about the existence of an elaborate conspiracy, in which the Nursing Home allegedly plots against its own residents (56.1 St. ¶ 25), which speculation, either as to the "conspiracy" itself or to its purported retaliatory motive, is completely unsupported by any admissible evidence. It is well-established in this Circuit that such conclusory allegations will not suffice to defeat summary judgment. *Goenaga, supra,* at 18.

Finally, plaintiff admits that she did what she was fired for doing—refused to cooperate in the investigation about

---

6. Mr. Schneiderman, the Director of Human Resources, was hired by St. Cabrini in December 1999 (Schneiderman Affidavit, ¶ 1). Ms. Nappi, the Associate Director of Nursing Services, was hired by St. Cabrini in August 1999 (Nappi Affidavit, ¶ 1). Ms. Patton, the Director of Nursing Services, was hired by St. Cabrini in February 1999 (Patton Affidavit, ¶ 1). *See also* 56.1 St. ¶ 28.

EO's injuries. Although plaintiff was given four separate opportunities to comply with her employer's request that she submit a written statement, plaintiff admits that she never did so (56.1 St. ¶¶ 14, 16, 18, 20). Nor does plaintiff dispute that it is essential to the continued certification and operation of the Nursing Home that all employees cooperate in investigations into resident injuries. Plaintiff's insubordination deliberately interfered with that basic function.

## PLAINTIFF HAS FAILED TO RAISE AN ISSUE OF FACT CONCERNING THE PRETEXTUAL NATURE OF ST. CABRINI'S REASON FOR TERMINATING HER EMPLOYMENT

■ Even if plaintiff had made out a prima facie case of retaliation (which she cannot), she does not offer any admissible evidence to show that St. Cabrini's proffered explanation is false, and merely a pretext for retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). As noted previously, plaintiff admits the conduct for which she was terminated, *i.e.*, repeatedly refusing to cooperate in the investigation of a resident's injury (56.1 St. ¶¶ 14, 16, 18, 20). Moreover, the admissible evidence shows that plaintiff was terminated for that misconduct (56.1 St. ¶ 19, 20, 21). After plaintiff's initial refusal to submit a written statement on February 29, 2000, or to dictate a statement to her supervisor, St. Cabrini offered plaintiff *three* additional opportunities on March 6, 15, and 17 to comply with its request for a statement—and on each occasion, plaintiff refused (56.1 St. ¶¶ 14, 16, 18, 20). Plaintiff's deliberate obstruction of St. Cabrini's investigation of the injury was intolerable, because plaintiff threatened the Nursing Home's ability to care for its residents appropriately and to comply with state regulations regarding the reporting of in-

juries. Indeed, in the collective experience of Mr. Schneiderman, Ms. Patton, Ms. Nappi, and Ms. Maybury, no other nursing home employee, at St. Cabrini or elsewhere, has ever refused to cooperate in an investigation into a resident injury (56.1 St. ¶ 22). Confronted with such flagrant insubordination, St. Cabrini had no alternative but to terminate plaintiff's employment.

In support of her claim of retaliation, plaintiff alleges, again without evidentiary support, that St. Cabrini fabricated, or perpetrated, E.O.'s injury to thwart plaintiff's efforts to seek a management post, claiming that St. Cabrini "needed" her and her work as CNA was indispensable to St. Cabrini's operations (56.1 St. ¶ 25). Plaintiff also claims that St. Cabrini resented her efforts to further her education, and sought to enlist her to carry out an unspecified but sinister agenda (56.1 St. ¶ 25). Plaintiff offers no evidence to support any of these contentions. Her bald assertion of these matters does not suffice to create a genuine dispute of material fact. *Goenaga, supra*, at 18; *Ofudu, supra*, at 516.

Plaintiff's claim of pretext is also belied by the fact that she cooperated in at least one investigation *after* allegedly filing her internal complaint, in April 1999, by submitting a resident incident report on her own stationery stating that she knew nothing about how one resident H.M.'s injury had occurred (56.1 St. ¶ 31). St. Cabrini accepted this statement, and plaintiff had no further involvement in the investigation. *Id.* This illustrates that plaintiff was familiar with the investigative process. And because she had already filed her claim of discrimination (the December 1998 letter, which I am assuming was sent for purposes of this motion), plaintiff was also aware that she could participate in an investigation, and even deny knowledge of an incident, without being retaliated

against. Plaintiff offers no explanation whatsoever why St. Cabrini would have passed up an opportunity to retaliate against her in April 1999—just four months after she sent the December 1998 letter—and wait almost another year to get rid of her.

Because plaintiff admits that the facts underlying St. Cabrini's proffered explanation are true, and that she was insubordinate, she raises no genuine issue of material fact as to pretext.

### Conclusion

Based on the foregoing, defendant's motion for summary judgment is granted, and the complaint is dismissed. The Clerk is directed to close the file. Plaintiff has thirty (30) days from the date this order is entered in the office of the Clerk of the Court to file a Notice of Appeal if she wishes to pursue this matter in the United States Court of Appeals for the Second Circuit. Any Notice of Appeal should be filed in the office of the Clerk of the District Court.