DECISION
Plaintiff-appellant, Paul I. Caldwell, appeals from the Ohio Court of Claims, which rendered judgment in favor of defendant-appellee, the Ohio State University ("OSU").
Caldwell served as the OSU men's lacrosse coach from September 1, 1993 until August 31, 1997. After OSU declined to renew his contract for the 1998 season, Caldwell filed this wrongful discharge lawsuit. On October 23, 2000, this case went to trial on the following claims: (1) age discrimination, (2) handicap discrimination, (3) wrongful discharge in violation of public policy, and (4) breach of oral contracts regarding the use of an automobile and the return of personal property.
The following evidence was offered at trial or by stipulation. In 1993, Jim Jones, the OSU athletic director at that time, hired Caldwell to coach the OSU men's lacrosse team. When he was hired in 1993, Caldwell was over fifty years old, and he had high blood pressure. Caldwell's contract was renewed continuously in 1994, 1995 and 1996.
In 1994, Andy Geiger replaced Jim Jones as the OSU athletic director. Geiger testified that he was aware that, in the years before Caldwell was hired as lacrosse coach, the OSU lacrosse program "was in some disarray, and that behavior of the student athletes, academically and socially, was inadequate." (Tr. at 20.) He testified that Caldwell was hired "in order to address those things." (Tr. at 20.) By all accounts, social and academic performance of the students in the lacrosse program improved under Caldwell.
Geiger further testified, however, that the lacrosse team was not competitive. Geiger evaluated the team as follows:
 Q. Turning back, though, to the competitive success of the program, how would you characterize Mr. Caldwell's coaching in terms of competitive success of the Lacrosse program?
 A. I felt that our team was at best ordinary and, in fact, as I observed some of the games in which we played, I thought we were lacking fundamentally and on occasion were not very good at all. [Tr. at 35.]
Geiger testified that he attended an OSU lacrosse game at Denison University in March 1997, and that his observation at that game played an "important part" in his decision not to renew Caldwell's contract. Geiger described his reaction to that game as follows:
 A. * * * I was dismayed at the way we played that coach and the inability to throw and catch and incapability to clear the ball from the offensive zone to the offensive zone. The out-and-out complete domination of Ohio State was an unacceptable performance, and it was upsetting.
 Q. Did the Lacrosse team's performance in that game prompt you to begin considering not to renew Mr. Caldwell's contract?
 A. It began more serious review of where the Lacrosse program is, and since we had already began to evaluate the sport as to begin a funding base that would challenge it for national honors in Lacrosse, it certainly caused me to question the leadership there. [Tr. at 36-37.]
Geiger testified that there were two other incidents during the 1997 season that caused him concern. First, the OSU president alerted Geiger that a hotel patron had complained that Caldwell had used vulgarity and yelled at members of the lacrosse team in a public hotel atrium in Baltimore. Second, Geiger learned that Caldwell had grabbed one of his player's face masks and jerked the player's head back and forth at a game in Denver, prompting a letter by the Denver team physician, who was concerned for the player's health and safety.
Geiger testified as follows regarding the timing and reason for his decision not to renew Caldwell's contract:
 Q. At about what time did you conclude that you wouldn't be renewing Mr. Caldwell's contract?
 A. It was in the period of May that we generally are making those kinds of decisions, toward the end of a competitive season, and I had come to the conclusion throughout the course of the season, including the incidents that I heard about, but just based on my knowledge of the game of Lacrosse, my knowledge of the reputation that Ohio State has as a Division 1 Lacrosse program, that if we were going to try to compete at the highest level in Lacrosse, which is something we very much wanted to do, that we would need a new coach.
* * *
 A. The change was made in our men's Lacrosse program because I thought we should have a coach who was at a higher level of ability than Mr. Caldwell, and that's the only reason the change was made. [Tr. at 40, 90.]
Geiger testified that he did not recall whether he had been advised that Caldwell was suffering from physical or emotional ailments before Geiger made the decision not to renew Caldwell's contract. Geiger stated, however, that Caldwell's age and health had no bearing on his decision.
On May 30, 1997, Geiger advised Caldwell that his contract would not be renewed. Caldwell was fifty-eight years old. Geiger hired Joe Breschi to replace Caldwell as the OSU men's lacrosse coach. Joe Breschi was twenty-nine years old. In a radio interview given in 1999, Geiger stated: "I hope that folks in central Ohio will get acquainted with Lacrosse. A brilliant young coach in Joe Breschi with the men's Lacrosse program." (Tr. at 244.)
Bill Myles was Caldwell's supervisor for part of his tenure as OSU lacrosse coach, including the 1997 season. Myles testified that, after the end of the 1997 season, he called Caldwell to ask him about the incident in the hotel atrium in Baltimore and to discuss Myles' observation that Caldwell was inconsistent with his coaching style, alternating between fiery and blasé. According to Myles, Caldwell told him that he had been having medical problems and that he had not been taking his medications. Caldwell informed Myles that he felt he might need to take a break from coaching until he got his medical concerns under control. Myles testified that he did not believe that Caldwell had serious medical problems; rather, Myles believed that Caldwell's explanation might be an excuse for his behavior. Although Myles admitted that he spoke to Geiger about Caldwell's medical issues and his request for a leave of absence, he did not recall whether the conversation took place before or after Geiger decided not to renew Caldwell's contract.
Caldwell testified that, despite the fact that he was never given scholarships with which to recruit better athletes, he received satisfactory performance reviews for the 1994, 1995 and 1996 seasons. He noted that he was never suspended, placed on probation, or subjected to any form of progressive discipline. According to Caldwell, after Geiger observed the OSU game against Denison University in March 1997, Geiger stated that "time had passed [Caldwell] by." (Tr. at 180.)
Caldwell acknowledged the incidents in Baltimore and Denver, but he attributed his behavior to a medical condition. Caldwell testified that, throughout his tenure as OSU lacrosse coach, he suffered from high blood pressure and, on occasion, an irregular heartbeat. He stated that, in August 1996, OSU athletic department physician Dr. Trent Sickles discontinued Caldwell's blood pressure medication, which caused Caldwell to become anxious and temperamental.
Caldwell testified that he discussed his medical condition with Bill Myles after the incident in Denver and again in May 1997. At the meeting in May, Caldwell told Myles that he would be meeting with Dr. Sickles and would ask Dr. Sickles to speak with Myles about Caldwell's medical condition.
Caldwell met with Dr. Sickles on May 20, 1997. Dr. Sickles described the visit as follows in a patient progress report:
SUBJECTIVE
 Paul is here for follow up of his blood pressure. In addition, he has a lot of concerns which he raised with me for the first time today. Apparently, there has been a number of episodes where he has essentially lost his temper and lost control. He related one episode to me regarding an episode in Denver where he grasped for one of his players by the face mask and screamed out of control at him. Apparently, there has been other times during practice where he essentially looses control of himself. He related a second episode where he was apparently getting ready to leave on a road trip when he went into the locker room and screamed and yelled for what he recognizes are really rather trivial reasons.
* * *
ASSESSMENT
1. Hypertension borderline back on his Lotensin
 2. Problem related to symptoms of lost control and temper.
PLAN
 Will have him continue with his medication. I will discuss this with Dr. Carr regarding appropriate intervention, although, his symptoms do seem to be improved while he is on blood pressure medication, I am not convinced that this is all that Paul needs to help him with his symptoms of loss of control. He asked me if I would speak with either Mr. Myers or Mr. Geiger. * * *
Caldwell admitted that he did not know whether Dr. Sickles ever spoke with Bill Myles and that he did not know whether Geiger knew about Caldwell's medical condition before he made the decision not to renew his contract. Myles testified that he did not speak to Dr. Sickles about Caldwell until Caldwell had been informed that his contract would not be renewed.
Caldwell introduced into evidence a portion of the OSU operating manual entitled "APPOINTMENT OF UNCLASSIFIED PROFESSIONAL STAFF." The manual states, in part, as follows:
 3. When a member of the Unclassified Professional Staff category is unable to perform satisfactorily the requirements of her/his position, a reasonable effort will be made to place the individual in another suitable job. However, it is recognized that there will be cases where it is in the best interest of the University and the individual to terminate his/her services.
Caldwell testified that, when Geiger informed him of May 30, 1997 that his contract would not be renewed, Caldwell asked Geiger if he could remain employed in some capacity with OSU athletic department. Geiger admitted that he did not try to find another position for Caldwell.
After the trial concluded, on November 2, 2000, Caldwell filed a motion for leave to file an amended complaint. By this motion, Caldwell sought to add three new causes of action: (1) breach of contract based upon the terms of the OSU operating manual; (2) violation of the equal pay act; and (3) violation of the family medical leave act. The trial court denied Caldwell's motion on December 21, 2000. Although the case had been tried to Judge Leach, the entry denying Caldwell's motion for leave to file an amended complaint was signed by Judge Shoemaker.
On July 23, 2001, the trial court entered judgment in OSU's favor on all claims. Appellant now assigns the following errors:
 1. A judge other than the trial judge has no lawful authority to issue an Entry during the period following a bench trial but prior to the time the trial judge issues a final Decision and Entry.
 2. The trial judge abused his discretion by completely ignoring substantial evidence of age discrimination.
 3. The trial judge erred as a matter of law by applying the wrong legal standard to Plaintiff-Appellant's claim of handicap discrimination.
By his first assignment of error, Caldwell contends that we should remand the trial court's decision because Judge Shoemaker, who was not the trial judge, signed the December 21, 2000 entry denying Caldwell's post-trial motion for leave to file an amended complaint. Caldwell argues that Judge Shoemaker lacked authority to sign the entry because he was not the trial judge and that, accordingly, the entry is void. Caldwell further argues that the entry denying his motion for leave to file an amended complaint was an abuse of discretion, as the amended complaint would have added a claim for breach of contract, and the breach of contract claim conformed to the evidence. We disagree.
Caldwell argues that Judge Shoemaker had no power to sign the entry because he had not tried the case. Caldwell has not cited to any authority, however, that would demonstrate that Judge Shoemaker lacked power to sign the entry. The cases cited by Caldwell are inapposite, as they pertain to whether an administrative judge has authority to rule on motions in cases assigned to a trial judge under the personal docket system in a multi-judge division of a court of common pleas. See Rosenberg v. Gattarello (1976), 49 Ohio App.2d 87, 94; Berger v. Berger (1981), 3 Ohio App.3d 125, 126. The case at issue was decided in the Ohio Court of Claims, which does not have a single assignment system, not in a multi-judge division of a court of common pleas.
Moreover, we conclude that, contrary to Caldwell's representation, the entry demonstrates that Judge Leach ruled on the motion. The entry is signed as follows:
This signature demonstrates that Judge Shoemaker was signing on behalf of Judge Leach, and not in his own capacity as a decision maker. Accordingly, we find that the entry is valid.
Caldwell further argues that the trial court abused its discretion by denying Caldwell's motion to amend with regard to his claim for breach of the OSU operating manual because he had offered evidence at trial to support this claim. Even if the trial court had abused its discretion in denying Caldwell's motion with regard to breach of the OSU operating manual, we find any resulting error would be harmless.
Civ.R. 61 provides, in pertinent part, as follows:
 No error * * * or defect in any ruling or order or in anything done or omitted by the court * * * is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. * * *
Notwithstanding its ruling on Caldwell's motion to amend his complaint, the trial court expressly considered and rejected the merits of Caldwell's claim for breach of the operating manual. Specifically, the trial court stated, as follows, in its opinion:
 * * * During the course of trial, plaintiff amended his complaint to supplement his breach of contract claim and to assert an additional claim for breach of employment contract.
* * *
 As stated above, plaintiff asserted an additional claim for breach of his employment contract at trial. Specifically, plaintiff alleged that defendant breached Policy No. 4.25, paragraphs three and six of defendant's Operating Manual.
 With regard to paragraph three, the manual clearly states that although defendant agreed to make a "reasonable" effort to place an unclassified professional staff member who is unable to perform the requirements of his position in another suitable job, defendant "recognized that there will be cases where it is in the best interest of the University and the individual to terminate his/her services." Given the unique considerations that are involved in defendant's decision to select a coach for its athletic teams, the court finds that defendant acted within its discretion when it decided that it was in the best interest of defendant and plaintiff to terminate his services. Furthermore, having made the decision to terminate plaintiff's employment at the end of the 1996-97 season, the court finds that defendant's decision not to conduct plaintiff's annual performance review, as provided in paragraph six of the manual, was reasonable and did not constitute a breach of his employment contract.
Accordingly, any error regarding Caldwell's motion to amend his complaint to add a claim for breach of the OSU operating manual would be harmless error. We overrule Caldwell's first assignment of error.
By his second assignment of error, Caldwell argues that the trial court abused its discretion by ignoring substantial evidence of age discrimination. In essence, Caldwell argues that the verdict in favor of OSU on the age discrimination claim was against the manifest weight of the evidence. We disagree.
In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, at 387.
R.C. 4112.02 states, in pertinent part, as follows:
It shall be an unlawful discriminatory practice:
 (A) For an employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
Federal case law regarding employment discrimination is instructive in cases brought under R.C. 4112.02. Little Forest Medical Ctr. of Akron v. Ohio Civ. Rights Comm. (1991), 61 Ohio St.3d 607, 609.
A plaintiff has the initial burden of establishing a prima facie case of age discrimination. Texas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248, 253, citing McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, 802. The establishment of a prima facie case gives rise to a reciprocal burden on the part of the employer "to articulate some legitimate, nondiscriminatory reason" for its action. Id. If the employer carries its burden, the plaintiff must then be afforded "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." Id.
A plaintiff may establish a prima facie case of discrimination directly by presenting evidence of any nature to show that the adverse employment action taken by the employer was more likely than not motivated by discriminatory intent. Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, 583. A plaintiff may also establish a prima face case of discrimination indirectly upon application of the analytical framework established by the United States Supreme Court in McDonnell Douglas. Id. Accordingly, in the absence of direct evidence of discrimination, a plaintiff may raise an inference of discriminatory intent by establishing that: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position held; and (4) comparable, nonprotected persons were treated more favorably. Id. at 582.
Caldwell's age discrimination claim is based on theories of disparate impact and disparate treatment. To prevail on a theory of disparate treatment discrimination, a plaintiff must prove that the protected trait motivated his employer's decision. Albaugh v. Columbus Div. of Police (1999), 132 Ohio App.3d 545, 550-551. To prevail on a theory of disparate impact age discrimination, a plaintiff must prove that an employer's facially neutral policies or practices fall more harshly on a protected group. Id.
With regard to his claim under the disparate treatment theory, Caldwell argues that the trial court erred because it ignored substantial evidence of age discrimination. We disagree and conclude that the trial court did not lose its way in returning a verdict in favor of OSU on Caldwell's disparate treatment age discrimination claim.
The trial court's opinion demonstrates that it simply concluded that Caldwell did not offer sufficient evidence to prove that Caldwell's age motivated Geiger's decision not to renew Caldwell's contract. Contrary to Caldwell's assertion that it ignored evidence, the trial court expressly concluded that two comments attributed to Geiger his statements that "time had passed [Caldwell] by" and that Caldwell's replacement was "[a] brilliant young coach" were stray marks and not indicative of discriminatory motive. Moreover, we conclude that there was ample evidence in the record to support the trial court's conclusion that Caldwell's competitive success record and personal behavior problems, not his age, motivated Geiger's decision not to renew Caldwell's contract.
With regard to his theory of disparate impact, Caldwell argues that the trial court ignored substantial evidence that Geiger failed to make a reasonable effort to place terminated head coaches in other suitable jobs, thereby ignoring the OSU operating manual's policy. Caldwell argues that Geiger's failure to follow the policy had a disparate impact on older coaches. We conclude that Caldwell misconstrues the theory of disparate impact, which requires proof that a defendant's implementation of a facially neutral policy impacts unlawfully on members of a protected class. We conclude that the trial court did not lose its way when it rejected Caldwell's theory of disparate impact discrimination. Accordingly, we overrule Caldwell's second assignment of error.
By his third assignment of error, Caldwell contends that the trial court erred by applying the wrong legal standard to his handicap discrimination claim. The appropriate standard of review is whether the decision of the trial court is contrary to law. We will not disturb the trial court's judgment if it is "supported by some competent, credible evidence going to all the essential elements of the case." C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. "`If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment.'" Estate of Barbieri v. Evans (1998),127 Ohio App.3d 207, 211.
Caldwell argues that "the trial court should have applied the legal standard under Ohio Rev. Code § 4112.01(A)(13)." In its decision, however, the trial court expressly articulated the standard in R.C.4112.01(A)(13), the same standard that Caldwell contends that the court should have used. We conclude that the trial court's judgment on the handicap discrimination claim is supported by competent, credible evidence.
R.C. 4112.02 provides in pertinent part as follows:
It shall be an unlawful discriminatory practice:
 (A) For any employer, because of the * * * handicap * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
"Handicap" is defined in R.C. 4112.01(13) as follows:
 * * * [A] physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeking, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.
In order to establish a prima facie case for unlawful handicap discrimination, a plaintiff must prove: "(1) that he or she was handicapped; (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped; and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question." Hood v. Diamond Products, Inc. (1996), 74 Ohio St.3d 298, paragraph one of the syllabus.
"Once the plaintiff establishes a prima facie case of handicap discrimination, the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken." Id. at 302, citing Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm. (1981), 66 Ohio St.2d 192, 197. "Legitimate, nondiscriminatory reasons for the action taken by the employer may include * * * the inability of the employee * * * to * * * perform, with reasonable accommodations, the essential functions of the job in question." Hood, at 302. "[I]f the employer establishes a nondiscriminatory reason for the action taken, then the employee * * * must demonstrate that the employer's stated reason was a pretext for impermissible discrimination." Id., citing Plumbers Steamfitters, at 198. "'[A] reason cannot be proved to be "a pretext for discrimination" unless it is shown both that the reason was false, and that discrimination was the real reason.'" Brown v. Renter's Choice, Inc. (N.D.Ohio. 1999), 55 F. Supp.2d 788, 795, quoting St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 512, n. 4.
The trial court's conclusion that Caldwell was not handicapped as defined in R.C. 4112.01(13) is supported by competent, credible evidence. Although Dr. Sickles' progress report indicates an assessment of hypertension and "problem related to symptoms of lost control and temper," the record does not demonstrate a diagnosis or record of a physical or mental impairment that substantially limited a major life activity. The record also belies Caldwell's argument that he was terminated because he was regarded as having a physical or mental impairment. Geiger testified that he did not recall whether he knew about Caldwell's medical issues when he made the decision not to renew Caldwell's contract, and Caldwell admitted that he did not know whether Geiger was aware of the medical issues. Although Caldwell told Myles that he had medical concerns, Myles testified that, even after this conversation, he did not believe that Caldwell had medical problems that impacted his job performance, and he concluded that Caldwell was offering this explanation as an excuse for his behavior. Accordingly, we overrule Caldwell's third assignment of error.
For the foregoing reasons, appellant's assignments of error are overruled, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
PETREE and KLATT, JJ., concur.